101 F.3d 239
 65 USLW 2374
 Bruce SMITH, as personal representative of Ingrid Smith,
deceased and on behalf of all others similarly situated;
Paul S. Hudson, personal representative of the Estate of
Melina K. Hudson, deceased; Bruce D. Abbott; et al.,
Plaintiffs-Appellants,
v.
SOCIALIST PEOPLE'S LIBYAN ARAB JAMAHIRIYA; Libyan External
Security Organization, also known as Jamahiriya
Security Organization; Libyan Arab
Airlines, Defendants-Appellees,
Abdel Basset Ali Al-Megrahi, also known as Abdelbaset Ali
Mohmed, also known as Adbelbaset Ali Mohmed Al Megrahi, also
known as Mr. Baset, also known as Ahmed Khalifa Abdusamad,
also known as Abd Al-Basit Al-Magrahi, and Lamen Khalifa
Fhimah, also known as Al Amin Khalifa Fhimah, also known as
Mr. Lamin, Defendants.
 Nos. 1241, 1572 and 1573, Dockets 95-7930, 95-7931 and 95-7942.
 United States Court of Appeals,
Second Circuit.
 Submitted March 28, 1996.
Decided Nov. 26, 1996.
Order Recalling Mandate and Modifying
Opinion Feb. 10, 1997.
 
 Timothy C. Russell, Washington, DC (Douglas E. Rosenthal, Daniel N. Segal, Daniel J. Shonkwiler, Sonnenschein Nath & Rosenthal, Washington, DC; Douglas R. Rutzen, Int'l Center for Not-for-Profit Law, Washington, DC; Michael Reisman, Yale Law School, New Haven, CT; Allan Gerson, Mark S. Zaid, Washington, DC; Richard Emery, Andrew Celli, New York City; on the brief), for plaintiffs-appellants.
 John R. Bartels, Jr., Bartels & Feureisen, White Plains, NY (Robert C. Mirone, Mirone & Shields, New York City; Abdelhay Sefrioui, Abdelhay et Anne Sefrioui, Paris, France, on the brief), for defendants-appellees.
 (John F. Welsh, Scott A. Birnbaum, Richard S. Sanders, Testa, Hurwitz & Thibeault, Boston, MA; Nathan Levin, Julie L. Mendel, submitted a brief, for amicus curiae International Association of Jewish Lawyers and Jurists (American Section)).
 (Johnathan B. Schwartz, Linda Jacobson, Mary Catherine Malin, Office of the Legal Adviser, U.S. Dept. of State, Washington, DC; Frank W. Hunger, Stephen W. Preston, Douglas N. Letter, Freddi Lipstein, Civil Div., U.S. Dept. of Justice, Washington, DC, submitted a brief, for amicus curiae, United States of America).
 Before: NEWMAN, Chief Judge, OAKES and PARKER, Circuit Judges.
 JON O. NEWMAN, Chief Judge:
 
 
 1
 In Kadic v. Karadzic, 70 F.3d 232 (2d Cir.1995), this Court ruled that a violation of certain fundamental norms of international law can be redressed by a civil suit brought in a United States district court against private citizens under the Alien Tort Claims Act, 28 U.S.C. § 1350 (1994). The pending appeal presents the issue of whether such violations can be redressed by a civil suit brought in a United States district court against a foreign state. The more precise issue is whether such a suit--brought primarily on behalf of victims of an aircraft bombing--is prohibited by the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602-1611 (1994), as it read prior to the recent amendment that explicitly permits suits against foreign states in some circumstances for acts in violation of fundamental international norms such as aircraft sabotage, see Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, § 221(a), 110 Stat. 1214, 1241 (1996) (to be codified at 28 U.S.C. § 1605(a)(7)).
 
 
 2
 The representatives of two persons who died as a result of the bombing of Pan American ("Pan Am") Flight 103 over Lockerbie, Scotland, in 1988 and a group of former Pan Am employees appeal, pursuant to Fed.R.Civ.P. 54(b), from judgments of the District Court for the Eastern District of New York (Thomas C. Platt, Jr., Judge), dismissing their suits against The Socialist People's Libyan Arab Jamahiriya, Libyan Arab Airlines, and The Libyan External Security Organization (collectively "Libya") for lack of subject matter jurisdiction. We affirm.
 
 Background
 
 3
 We have previously considered lawsuits by the families of victims of the bombing of Pan Am Flight 103 brought against Pan Am for the carrier's role in permitting a suitcase containing a bomb to be loaded onto the aircraft. See In re Air Disaster at Lockerbie Scotland on December 21, 1988, 37 F.3d 804 (2d Cir.1994). This appeal concerns three lawsuits alleging that the government of Libya, acting through its agents, deliberately caused the bombing. The plaintiffs are Bruce Smith, suing as representative of Ingrid Smith, his deceased wife (No. 95-7930), Paul S. Hudson, suing as representative of Melina K. Hudson, his deceased daughter (No. 95-7931), and Bruce D. Abbott and other former pilots, co-pilots, flight engineers, and flight attendants of Pan Am (No. 95-7942). Smith, Hudson, and the former Pan Am employees are all citizens of the United States. Smith brings his lawsuit on behalf of a class of family members of all passengers and crew members killed in the bombing.
 
 
 4
 The complaints allege that the Libyan governmental defendants, acting principally through two Libyan agents, Abdel Basset Ali Al-Megrahi and Lamen Khalifa Fhimah, planned and carried out the bombing of Pan Am Flight 103. Al-Megrahi and Fhimah have been indicted in the District of Columbia for their roles in the bombing.
 
 
 5
 The three lawsuits were originally filed in the District Court for the District of Columbia and transferred to the Eastern District of New York. On motions by the three Libyan state defendants to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction, the Smith and Hudson suits were dismissed. Smith v. Socialist People's Libyan Arab Jamahiriya, 886 F.Supp. 306 (E.D.N.Y.1995). This ruling was made applicable by stipulation to the Abbott suit. The three dismissals were certified for entry of final judgment pursuant to Fed.R.Civ.P. 54(b) because the suits remain pending against Al-Megrahi and Fhimah.
 
 Discussion
 
 6
 The parties are in agreement that the issue of Libya's amenability to suit in a United States court is governed by the Foreign Sovereign Immunities Act ("FSIA"). The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 443, 109 S.Ct. 683, 693, 102 L.Ed.2d 818 (1989). The FSIA recognizes the immunity of foreign states, 28 U.S.C. § 1604, subject to specified exceptions. The appellants advance four bases for asserting jurisdiction over Libya--(1) implied waiver, id. § 1605(a)(1), arising from Libya's alleged participation in actions that violate fundamental norms of international law; (2) implied waiver, id. § 1605(a)(1), arising from Libya's alleged guaranty of any damage judgment against the individual defendants; (3) occurrence of the alleged bombing on "territory" of the United States, id. § 1605(a)(5); and (4) conflict with the United Nations Charter, id. § 1604.
 
 1. Implied Waiver for Jus Cogens Violations
 
 7
 The FSIA removes the immunity of a foreign state in any case "in which the foreign state has waived its immunity either explicitly or by implication." Id. § 1605(a)(1). The appellants contend that an implied waiver has occurred by virtue of Libya's violation of fundamental international norms ("jus cogens "). Libya concedes, for purposes of this appeal, that its alleged participation in the bombing of Pan Am Flight 103 would be a violation of jus cogens, but it contests the premise of appellants' argument that such a violation demonstrates an implied waiver of sovereign immunity within the meaning of the FSIA.
 
 
 8
 The contention that a foreign state should be deemed to have forfeited its sovereign immunity whenever it engages in conduct that violates fundamental humanitarian standards is an appealing one. The argument was persuasively developed a few years ago in the California Law Review. See Adam C. Belsky et al., Implied Waiver Under the FSIA: A Proposed Exception to Immunity for Violations of Peremptory Norms of International Law, 77 Cal. L.Rev. 365 (1989). The argument is premised on the idea that because observance of jus cogens is so universally recognized as vital to the functioning of a community of nations, every nation impliedly waives its traditional sovereign immunity for violations of such fundamental standards by the very act of holding itself out as a state:
 
 
 9
 Jus cogens norms ... do not depend on the consent of individual states, but are universally binding by their very nature. Therefore, no explicit consent is required for a state to accept them; the very fact that it is a state implies acceptance. Also implied is that when a state violates such a norm, it is not entitled to immunity.
 
 Id. at 399 (emphasis added).[1]
 
 10
 The issue we face, however, is not whether an implied waiver derived from a nation's existence is a good idea, but whether an implied waiver of that sort is what Congress contemplated by its use of the phrase "waive[r] ... by implication" in section 1605(a)(1) of the FSIA. We have no doubt that Congress has the authority either to maintain sovereign immunity of foreign states as a defense to all violations of jus cogens if it prefers to do so or to remove such immunity if that is its preference, and we have no doubt that Congress may choose to remove the defense of sovereign immunity selectively for particular violations of jus cogens, as it has recently done in the 1996 amendment of the FSIA. To determine which course Congress chose when it enacted the FSIA in 1976, we examine first the terms of the statute and then the legislative history.
 
 
 11
 The text of section 1605(a)(1) is not conclusive as to the meaning of an implied waiver. It simply says that a foreign state shall not be immune in any case in which the foreign state has waived its immunity "either explicitly or by implication." We and other courts have observed that "the implied waiver provision of Section 1605(a)(1) must be construed narrowly." Shapiro v. Republic of Bolivia, 930 F.2d 1013, 1017 (2d Cir.1991); see Foremost-McKesson, Inc. v. Islamic Republic of Iran, 905 F.2d 438, 444 (D.C.Cir.1990); Joseph v. Office of the Consulate General of Nigeria, 830 F.2d 1018, 1022-23 (9th Cir.1987); Frolova v. Union of Soviet Socialist Republics, 761 F.2d 370, 377 (7th Cir.1985).
 
 
 12
 The concept of an "implied" waiver can have at least three meanings. First, such a waiver can mean that an actor intended to waive a protection, even though it did not say so expressly. Second, an implied waiver might arise whenever an act has been taken under circumstances that would lead a reasonable observer to conclude that the act generally manifests an intent to waive, whether or not the actor had such intent in the particular case. Both of these meanings involve a requirement of intentionality, the first being subjective and the second objective. A third meaning is that the law deems an actor to have surrendered a protection, regardless of the actor's subjective or objectively reasonable intent. "Waiver" in this third sense is more properly termed "forfeiture." See Forman v. Smith, 633 F.2d 634, 638 (2d Cir.1980). The text of the FSIA gives no indication as to the sense in which waiver "by implication" is used.
 
 
 13
 The legislative history of the FSIA provides important clues as to Congress's meaning. The Report of the House Judiciary Committee includes the following:
 
 
 14
 With respect to implicit waivers, the courts have found such waivers in cases where a foreign state has agreed to arbitration in another country or where a foreign state has agreed that the law of a particular country should govern a contract. An implicit waiver would also include a situation where a foreign state has filed a responsive pleading in an action without raising the defense of sovereign immunity.
 
 
 15
 H.R.Rep. No. 94-1487, at 18 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6617 ("House Report").
 
 
 16
 The House Report conveys two messages. First, the initial reference to circumstances in which "the courts" have found implied waivers arguably suggests that Congress was adopting whatever meaning courts have given, and perhaps might in the future give, to the concept of an implied waiver. That message is countered, however, by the fact that the House Report goes on to point out that, though some courts have allowed foreign states unilaterally to rescind waivers, the FSIA adopts the "better view" prohibiting such unilateral rescissions. Id. Plainly, Congress was not accepting all judicial interpretations of waiver.
 
 
 17
 Second, and more significantly, the House Report catalogues the types of action that were thought to exemplify an implied waiver. All three examples--agreeing to foreign arbitration, agreeing to apply foreign law to contract interpretation, and filing a responsive pleading without asserting an immunity defense--share a close relationship to the litigation process. On this appeal, the parties have taken opposing positions on whether an implied waiver must be subjectively intentional or whether waiver will be implied from conduct that objectively demonstrates an intention to waive. The three examples in the House Report do not definitively resolve that issue. For example, a state agreeing to apply foreign law to contract interpretation might subjectively intend to allow suit in the jurisdiction whose law applied, or might subjectively intend to be sued only in its own courts, albeit with the law of a selected jurisdiction applied; even if the state subjectively had the latter intent, the act of agreeing to apply foreign law could still be considered an objectively reasonable indication of the state's intent to be sued in the jurisdiction whose law applied. Whether subjective or objectively reasonable intent, or even in some circumstances forfeiture, was contemplated by Congress in enacting section 1605(a)(1), an issue we need not decide,[2] the three examples are persuasive evidence that Congress primarily expected courts to hold a foreign state to an implied waiver of sovereign immunity by the state's actions in relation to the conduct of litigation.
 
 
 18
 Whether or not an implied waiver might, in some circumstances, arise from a foreign state's actions not intimately related to litigation, we conclude that Congress's concept of an implied waiver, as used in the FSIA, cannot be extended so far as to include a state's existence in the community of nations--a status that arguably should carry with it an expectation of amenability to suit in a foreign court for violations of fundamental norms of international law.
 
 
 19
 The appellants vigorously argue that Congress would not have wanted to condone, by insulating from legal redress, such outrageous violations of jus cogens as the bombing of a passenger aircraft. The emotional power of that argument is not persuasive for at least two reasons. First, Congress's use of the concept of implied waiver in a sense less expansive than permitting suit for all violations of jus cogens is not equivalent to condonation of such lawless conduct. Congress might well have expected the response to such violations to come from the political branches of the Government, which are not powerless to penalize a foreign state for international terrorism. Second, when Congress recently amended the FSIA to remove the sovereign immunity of foreign states as a defense to acts of international terrorism, it enacted a carefully crafted provision that abolishes the defense only in precisely defined circumstances. For example, the new amendment withdraws the defense only for specified acts of terrorism, applies only to foreign states designated by the Secretary of State as a state sponsor of terrorism, and limits recovery to damages for personal injury or death, without extending to the damages for economic injury sought by the Abbott appellants. See AEDPA § 221(a). Mindful that subsequently enacted legislation might not be a reliable guide to the intent of a prior Congress, see United States v. Price, 361 U.S. 304, 313, 80 S.Ct. 326, 331, 4 L.Ed.2d 334 (1960), we nevertheless can rely on the recent amendment at least as an indication that Congress can legislate to open United States courts to some victims of international terrorism in their suits against foreign states without inevitably withdrawing entirely the defense of sovereign immunity for all jus cogens violations.
 
 
 20
 Moreover, we have been instructed that subsequent Congressional actions "should not be rejected out of hand as a source that a court may consider in the search for legislative intent." Andrus v. Shell Oil Co., 446 U.S. 657, 666 n. 8, 100 S.Ct. 1932, 1938 n. 8, 64 L.Ed.2d 593 (1980). It is arguable that the action of the 104th Congress in removing the sovereign immunity defense for some violations of jus cogens is an indication that the 94th Congress had not intended to remove the defense for all such violations. See Seatrain Shipbuilding Corp. v. Shell Oil Co., 444 U.S. 572, 596, 100 S.Ct. 800, 814, 63 L.Ed.2d 36 (1980) ("views of subsequent Congresses ... are entitled to significant weight"). Even if that inference is not drawn, we can rely on the recent amendment at least as evidence that Congress is not necessarily averse to permitting some violations of jus cogens to be redressed through channels other than suits against foreign states in United States courts.
 
 
 21
 Our reluctance to construe the concept of implied waiver to include all violations of jus cogens is not grounded, however, on an inference from the action of the 104th Congress; it is based on our understanding of what the 94th Congress meant when it illustrated the inexact phrase "waive[r] ... by implication" with examples drawn entirely from the context of conduct related to the litigation process. We recognize that the examples given in the House Report are not necessarily the only circumstances in which an implied waiver might be found. See Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 721 (9th Cir.1992). Nevertheless, they indicate the principal context that Congress had in mind, see id. at 720 (remanding for consideration of implied waiver based on initiation of malicious criminal proceedings against FSIA plaintiff and request to United States court for judicial assistance), and, at a minimum, they preclude a sweeping implied waiver for all violations of jus cogens.
 
 
 22
 Two circuits have considered whether a violation of a jus cogens standard constitutes an implied waiver within the meaning of the FSIA, and both have rejected the claim. See Princz v. Federal Republic of Germany, 26 F.3d 1166, 1174 (D.C.Cir.1994); Siderman de Blake, 965 F.2d at 714-19. Princz rejected the claim on the D.C. Circuit's view that an implied waiver under the FSIA will be found only where a foreign state intended to permit suit. See Princz, 26 F.3d at 1174 ("[T]he amici's jus cogens theory of implied waiver is incompatible with the intentionality requirement implicit in § 1605(a)(1).").[3] Siderman de Blake reasoned that the Supreme Court's decision in Amerada Hess precludes viewing jus cogens violations as an implied waiver. 965 F.2d at 718-19. That contention is questionable since no claim of waiver arising from a jus cogens violation was made in Amerada Hess. Though the Court there ruled that "immunity is granted in those cases involving alleged violations of international law that do not come within one of the FSIA's exceptions," Amerada Hess, 488 U.S. at 436, 109 S.Ct. at 689, the Court was not asked to determine whether a jus cogens violation could constitute an implied waiver within the meaning of section 1605(a)(1). Our rejection of the claim that a jus cogens violation constitutes an implied waiver within the meaning of the FSIA rests neither on reading a subjective "intentionality" requirement into section 1605(a)(1), nor on the precedent of Amerada Hess. It rests on our understanding that Congress did not intend the implied waiver exception of section 1605(a)(1) to extend so far, however desirable such a result might be.
 
 
 23
 2. Implied Waiver from Alleged Guaranty of Damages Judgment
 
 
 24
 The appellants contend that Libya impliedly waived its immunity from suit in United States courts by reason of the following paragraph contained in a February 27, 1992, letter from Ibrahim M. Bishari, Secretary of the Libyan government's "People's Committee for Foreign Liaison and International Cooperation," to the Secretary General of the United Nations:
 
 
 25
 Despite the fact that discussion of the question of compensation is premature, since it would only follow from a civil judgement based on a criminal judgement, Libya guarantees the payment of any compensation that might be incurred by the responsibility of the two suspects who are its nationals in the event that they were unable to pay.
 
 
 26
 This paragraph concerning guaranty of payment of a judgment against Al-Megrahi and Fhimah was contained in a three-page document that included proposals concerning handing the suspects over to a "third party," and various steps relating to "the issue of terrorism."
 
 
 27
 Libya rejects the claim of an implied waiver arising from the guaranty provision for several reasons. First, Libya contends that the letter is an integrated document, subject to conditions, and was not accepted by the United Nations. Second, Libya asserts that even if the guaranty paragraph can be considered as an independent proposal, it is not binding for lack of consideration. Third, Libya contends that even if a binding guarantee obligation arose, there was no waiver of immunity from suit in the courts of the United States to enforce such an obligation.
 
 
 28
 We agree with the third contention and do not consider the other lines of defense. The paragraph in Mr. Bishari's letter concerning a guaranty of payment contains no express or indirect reference to a waiver of sovereign immunity. See Amerada Hess, 488 U.S. at 442-43, 109 S.Ct. at 692-93 ("[W]e [do not] see how a foreign state can waive its immunity under § 1605(a)(1) by signing an international agreement that contains no mention of a waiver of immunity to suit in the United States courts or even the availability of a cause of action in the United States."). Though a guaranty is somewhat related to the litigation context illustrated by the three examples of implied waiver in the House Report, the paragraph in Mr. Bishari's letter does not bear such a close relationship to litigation as to support an implied waiver. If a foreign state undertook to guarantee payment of a judgment entered against its nationals in a United States court, the argument for an implied waiver would be much stronger. A generalized undertaking to pay the debt of a national, however, does not imply that the guaranteeing state agrees to be sued on such an undertaking in a United States court.
 
 
 29
 3. Occurrence on "Territory" of the United States
 
 
 30
 The FSIA removes immunity "in any case ... in which money damages are sought against a foreign state for personal injury or death ... occurring in the United States and caused by the tortious act or omission of that foreign state...." 28 U.S.C. § 1605(a)(5). The Act defines the "United States" to include "all territory and waters, continental or insular, subject to the jurisdiction of the United States." Id. § 1603(c). Appellants contend that Pan Am Flight 103 should be considered to have been "territory" of the United States for purposes of the FSIA. They rely on the principle that a nautical vessel "is deemed to be a part of the territory" of "the sovereignty whose flag it flies." United States v. Flores, 289 U.S. 137, 155, 53 S.Ct. 580, 585, 77 L.Ed. 1086 (1933).
 
 
 31
 Even if we assume, without deciding, that for some purposes an American flag aircraft is like an American flag vessel, but see United States v. Cordova, 89 F.Supp. 298, 301 (E.D.N.Y.1950), the fact that a location is subject to an assertion of United States authority does not necessarily mean that it is the "territory" of the United States for purposes of the FSIA. Cases rejecting FSIA jurisdiction over foreign states for torts committed at United States embassies make this point clear. See Persinger v. Islamic Republic of Iran, 729 F.2d 835, 839-42 (D.C.Cir.1984); McKeel v. Islamic Republic of Iran, 722 F.2d 582, 587-88 (9th Cir.1983). If FSIA immunity prevails with respect to torts in United States embassies, it cannot be displaced with respect to United States aircraft flying over a foreign land. Moreover, in Amerada Hess, the Supreme Court declined an invitation to equate "territory ... of the United States," for purposes of the FSIA, with all areas over which any United States jurisdiction might be asserted. The Court ruled that though the high seas were within the admiralty jurisdiction of United States courts, see The Plymouth, 70 U.S. (3 Wall.) 20, 36, 18 L.Ed. 125 (1865), they were not the "territory ... of the United States" within the meaning of the FSIA. Amerada Hess, 488 U.S. at 440, 109 S.Ct. at 691.
 
 4. Conflict with the United Nations Charter
 
 32
 The FSIA provides that a foreign state's immunity is "[s]ubject to existing international agreements to which the United States is a party at the time of enactment of [the FSIA]." 28 U.S.C. § 1604. Appellants contend that Libya's immunity has been displaced by reason of a conflict with the United Nations Charter. Appellants do not assert that any provision of the UN Charter subjects Libya to suit in the United States. Instead, they reason that Article 25 of the Charter binds all member nations to abide by decisions of the Security Council taken under Chapter VII of the Charter and contend that Security Council Resolution 748, adopted on March 31, 1992, commits Libya to pay compensation to the victims of Pan Am Flight 103.
 
 
 33
 Libya resists this contention on numerous grounds, including the arguments that Resolution 748 is not self-executing, that it was not intended to create judicially enforceable private rights, and that it does not compel payment by Libya. We reject the contention for the threshold reason that the FSIA's displacement of immunity, applicable to international agreements in effect at the time the FSIA was adopted, does not contemplate a dynamic expansion whereby FSIA immunity can be removed by action of the UN taken after the FSIA was enacted. Such a contention would encounter a substantial constitutional issue as to whether Congress could delegate to an international organization the authority to regulate the jurisdiction of United States courts. It would take an explicit indication of Congressional intent before we would construe an act of Congress to have such an effect. Cf. Industrial Union Dep't, AFL-CIO v. American Petroleum Institute, 448 U.S. 607, 645-46, 100 S.Ct. 2844, 2865-66, 65 L.Ed.2d 1010 (1980) (delegation of Congressional power narrowly construed to avoid constitutional issue). There is no such indication in section 1604.
 
 Conclusion
 
 34
 The bombing of Pan Am Flight 103 was an act of terrorism that has properly drawn the condemnation of the world community. Horrific as that act was, it cannot provide a basis for giving an unwarranted interpretation to an act of Congress simply to achieve a result beneficial to the families of the victims of the bombing. We hold that the FSIA, prior to the recent amendment, does not subject Libya to the jurisdiction of the District Court with respect to the bombing. Whether the recent amendment affords a remedy to some or all of the appellants remains to be determined in subsequent litigation.
 
 
 35
 The judgment of the District Court is affirmed.
 
 ORDER
 Feb. 10, 1997
 
 36
 Upon consideration of the motion of plaintiff-appellant Paul Hudson to recall the mandate and modify the opinion of November 26, 1996, and the opposition by defendants-appellants to that motion, it is hereby ORDERED that the motion is granted, the mandate is recalled, and the opinion is modified only to the extent that the case is remanded to the District Court with directions to entertain a motion to amend the complaint and make such disposition of such motion as may be appropriate under all the circumstances.
 
 
 
 [1]
 The argument for implied waiver based on a jus cogens violation has sometimes been articulated as resting on the idea that the foreign state impliedly waives its sovereign immunity, not by existing as a state within the community of nations, but by taking the action that constitutes the jus cogens violation. See Princz v. Federal Republic of Germany, 26 F.3d 1166, 1179 (D.C.Cir.1994) (Wald, J., dissenting) ("Germany implicitly waived its immunity by engaging in the barbaric conduct alleged in this case...."); Brief of Amici Curiae The Anti-Defamation League et al., quoted in Princz, 26 F.3d at 1173 ("A foreign state that violates these fundamental requirements of a civilized world thereby waives its right to be treated as a sovereign.")
 Presumably, the proponents of the argument mean that a state impliedly waives its immunity for jus cogens violations by holding itself out as a state within the community of nations, and that its violation of jus cogens standards is the act for which it is liable.
 
 
 [2]
 We have previously given some indication that the requisite intent is subjective. See Drexel Burnham Lambert Group Inc. v. Committee of Receivers, 12 F.3d 317, 327 (2d Cir.1993) (quoting with approval statement in Frolova, 761 F.2d at 378, that "waiver would not be found absent a conscious decision to take part in the litigation and a failure to raise sovereign immunity despite the opportunity to do so"). Two other circuits have so ruled. See Princz v. Federal Republic of Germany, 26 F.3d 1166, 1174 (D.C.Cir.1994); Frolova, 761 F.2d at 377-78
 
 
 [3]
 In dissent, Judge Wald accepted an intentionality requirement but concluded that "Germany could not have helped but realize that it might one day be held accountable for its heinous actions [in World War II] by any other state, including the United States." Princz, 26 F.3d at 1184. It is not clear in what sense she viewed "intentionality"; it is unlikely that Germany, before the Nuremberg trials, formed a subjective intent to be sued for wartime atrocities, and it is at least uncertain whether it would be objectively reasonable to attribute such an intent to it. Judge Wald appears to be using "implied waiver" in the sense of "forfeiture."