Jacob SAMPSON, Plaintiff,

v.

FEDERAL REPUBLIC OF GERMANY and the Conference on Jewish Material Claims Against Germany, Inc., Defendants.

No. 96 C 6242.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 10, 1997.

Jacob Sampson, Chicago, IL, pro se.

Michael D. McCormick, Stephen O'Donnell, Ungaretti & Harris, Paul Jordan Cherner, Michael, Best & Friedrich, Chicago, IL, for defendants.

### MEMORANDUM OPINION AND ORDER

ANN CLAIRE WILLIAMS, District Judge.

*Pro se* Plaintiff Jacob Sampson seeks a declaratory judgment that a question of actual controversy exists between him and Defendants Federal Republic of Germany and The Conference on Jewish Material Claims Against Germany, Inc. Both defendants have moved the court to dismiss the amended complaint under Rule 12(b) of the Federal Rules of Civil Procedure or, in the alternative, for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.[1] The court abhors the inhuman treatment that the Nazi regime perpetrated on Mr. Sampson. Furthermore, the court accepts that Sampson has not been fairly compensated for his suffering. However, for the reasons set forth below, the court grants defendants' motions to dismiss both Plaintiff Sampson's original complaint and amended complaint.

### Background

The court, in its discretion, treats both defendants' motions as motions to dismiss. In ruling on these motions to dismiss, the court "accept[s] as true the factual allegations of the complaint." *Lashbrook v. Oerkfitz,* 65 F.3d 1339, 1343 (7th Cir.1995) (citation omitted). Therefore, the following facts are taken from plaintiff's amended complaint, unless stated otherwise.

Jacob Sampson ("Sampson") is a Holocaust survivor. (Am.Compl.¶ I.) From 1939 to 1945, he was imprisoned, first in the Ghetto Lodz, Poland, and later in the Auschwitz concentration camp. (*Id.* ¶ III.) The Gestapo killed sixty members of his family at Aus-

---

1. Federal Republic of Germany bases its motion to dismiss on Rule 12(b)(1) for lack of subject matter jurisdiction and on Rule 12(b)(6) for failure to state a claim upon which relief can be granted. The Conference on Jewish Material Claims Against Germany, Inc. bases its motion to dismiss on Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Defen-

dants have filed motions to dismiss both the original and amended complaints. Because the original complaint and amended complaint raise the same basic allegations and the motions to dismiss raise the same grounds for dismissal, the court will consider the motions to dismiss the original complaint and the amended complaint in this Memorandum Opinion and Order.

chwitz. (*Id.*) Today, Sampson is a citizen of the United States and a resident of Chicago. (*Id.* ¶ I.)

The Conference on Jewish Material Claims Against Germany, Inc. (the "Claims Conference") is an international coalition of twenty-three Jewish nonprofit organizations. (Conf. Mem. Supp. Mot. to Dismiss at 3.) It is incorporated in the state of New York. (Mem. Supp. Am. Compl. at 4.) For over forty years, the Claims Conference has had ongoing discussions with the Federal Republic of Germany ("Germany") to secure restitution for Jewish survivors of the Nazi regime. (Conf. Mem. Supp. Mot. to Dismiss at 3.)

In 1952, representatives of the Claims Conference and Germany agreed on Protocols Nos. 1 and 2. (*Id.*) Protocol No. 1 called for Germany to "redress ... National–Socialist [Nazi] wrongs" and to "take as soon as possible all steps within [its] constitutional competence to ensure the carrying out of the [agreed upon] programme (sic)." (*Id.* Ex. 4.) Germany complied with this Protocol by enacting the German Federal Indemnification Law which made payments to Holocaust victims. (*Id.* at 3.) The Claims Conference did not administer any of this fund. (*Id.*)

Realizing that identifying and locating all possible Holocaust survivors would be impossible, Germany agreed in Protocol No. 2 to pay Israel DM 450 million for the benefit of the Claims Conference. (*Id.* at 3–4; Ex. 6.) The Claims Conference used this money for "the relief, rehabilitation and resettlement of Jewish victims of National–Socialist persecution [who did not live in Israel], according to the urgency of their needs." (*Id.* Ex. 6, Art. 2.)[2] Protocol No. 2 expressly provides that disputes will be handled by an Arbitral Commission established between Israel and Germany. (*Id.* Ex. 6, Art. 4; *see also,* Ex. 7, Arts. 14–15.)

Because some Holocaust victims never received any compensation, in 1980 the Claims Conference and Germany established the "Hardship Fund" to give a one-time payment to Holocaust survivors who had not received any prior compensation. (*Id.* at 4.) While the Claims Conference does administer the Hardship Fund, "its only role is to determine whether claimants [meet] the express requirements set forth in the German Guidelines. [It] is not, and never has been, permitted to differentiate between qualified applicants in the amount of the payment...." (*Id.* at 5.) The Hardship Fund expressly prohibits a "right of action to receive compensation." (*Id.* Ex. 8, § 3.)

Finally, in 1990, Germany and the Claims Conference established the "Article 2 Fund" to provide compensation to Nazi victims who had received minimal or no compensation. (*Id.* at 5.) The Article 2 Fund provides a one-time payment of DM 5000 and monthly payments of DM 500. (*Id.*) The Claims Conference administers the payments from the Article 2 Fund, but it does not have any discretion to deviate from Germany's guidelines. (*Id.* at 5–6.) Furthermore, the Article 2 Fund states that "[t]here is no legal claim to the payments provided according to this agreement." (*Id.* Ex. 9, Part IV, ¶ 2.)

Sampson filed a claim with Germany in 1948 and another claim in 1981 with the Hardship Fund. (Compl. ¶ IX.) He never received any reply to these requests. (*Id.*) However, his application for payments under the Article 2 Fund was approved in February 1996. (*Id.* Attach.) He received a one-time payment of DM 5000 and monthly payments of DM 500 retroactive to August 1995. (*Id.*; Conf. Mem. Supp. Mot. to Dismiss at 6.)

In September 1996, Sampson filed this claim seeking a declaratory judgment that he is entitled to state a claim against both defendants in the amount of $10 million plus costs. (Compl. ¶¶ II–III.) He claims that both defendants, separately and jointly, conspired to deprive him of his civil rights when they refused to fairly compensate him for his imprisonment by Nazi Germany. (*Id.* ¶¶ III–VI.) Furthermore, he claims that

**2.** Germany and Israel also signed a separate agreement in 1952 which called for an additional DM 3 billion as retribution for the "unspeakable criminal acts ... perpetrated against the Jewish people during the National–Socialist regime of terror." Germany gave this money to Israel because of the large number of Holocaust survivors who had settled in Israel. (Conf. Mem. Supp. Mot. to Dismiss at 4; Ex. 7.)

"defendants recognized but consistently failed to live up to their promises of full compensation." (Pl.'s Resp. to Mot. Dismiss Am. Compl. at 3.) After leave was given, Sampson filed an amended complaint in May 1997.[3] His amended complaint includes charges that (1) defendants embezzled funds that should go to Holocaust survivors, (2) they breached a covenant with him, and (3) they discriminated against him. (Am. Compl.¶¶ III–V, IX.)

### Analysis

■ Both defendants move the court to dismiss plaintiff's amended complaint under Rule 12(b) of the Federal Rules of Civil Procedure. A motion to dismiss tests the sufficiency of the complaint, not the merits of the suit. *Demitropoulos v. Bank One Milwaukee, N.A.*, 915 F.Supp. 1399, 1406 (N.D.Ill.1996)(citing *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir.1990)). Therefore, the court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the plaintiff. *Zinermon v. Burch*, 494 U.S. 113, 118, 110 S.Ct. 975, 979, 108 L.Ed.2d 100 (1990); *Colfax Corp. v. Illinois State Toll Highway Auth.*, 79 F.3d 631, 632 (7th Cir.1996) (citations omitted). The court will dismiss a claim only if "it appears beyond doubt that [the plaintiff] can prove no set of facts in support of his claim which would entitle him to relief." *Colfax*, 79 F.3d at 632 (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)).

■ Jacob Sampson brings his claims as a *pro se* plaintiff.[4] "[A]llegations of the *pro se* complaint [are held] to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972) (per curiam). Accordingly, "*pro se* complaints are

to be liberally construed." *Wilson v. Civil Town of Clayton, Ind.*, 839 F.2d 375, 378 (7th Cir.1988); *see also Hamlin v. Vaudenberg*, 95 F.3d 580, 583 (7th Cir.1996).

Sampson claims that he has not been fairly compensated for Nazi Germany incarcerating him in a concentration camp from 1939 to 1945. (Am.Compl.¶¶ IV–VI.) Furthermore, he claims that defendants diverted funds to "Gestapo murderers" that should have gone to him and other Holocaust survivors. (*Id.* ¶ V.)

Germany moves to dismiss Sampson's complaint (1) for lack of subject matter jurisdiction under the Foreign Sovereign Immunities Act, (2) in the alternative, for failure to state a claim upon which relief can be granted under the act of state doctrine, and (3) in the alternative, for failure to state a claim upon which relief can be granted under the statute of limitations.

The Claims Conference moves to dismiss Sampson's complaint for failure to state a claim upon which relief can be granted on the alternative grounds (1) that Sampson has no standing and therefore no claim, (2) that the act of state doctrine bars his suit, and (3) that the statute of limitations bars his claim.

The court will separately discuss Germany's sovereign immunity defense and Sampson's standing to sue the Claims Conference. The court will then discuss the act of state doctrine and the statute of limitations as they apply to both defendants. Finally, the court will discuss Sampson's other allegations against both defendants.

### I. FOREIGN SOVEREIGN IMMUNITIES ACT

■ Under the United States Constitution, the sole power to establish the inferior

---

**3.** The amended complaint raises the same allegations as the original complaint. The parties have filed fully briefed motions to dismiss the original complaint and the amended complaint.

**4.** Sampson, however, does have considerable experience in both federal and state courts. *See, e.g., Sampson v. Nowicki*, No. 95 C 7433, 1995 WL 765295 (N.D.Ill.Dec.21, 1995); *Sampson v. Village Discount Outlet, Inc.*, 832 F.Supp. 1163 (N.D.Ill.1993); *Sampson v. Marovitz*, No. 88 C

5697, 1988 WL 121588 (N.D.Ill. Nov.8, 1988); *Sampson v. Weidell*, No. 84 C 6360, 1988 WL 48245 (N.D.Ill. May 9, 1988); *Sampson v. Stipek*, No. 84 C 7749, 1987 WL 19814 (N.D.Ill. Nov.10, 1987); *Sampson v. Washington Paint Co.*, No. 85 C 1413, 1985 WL 5109 (N.D.Ill.Dec.27, 1985); *Sampson v. Hansen*, 163 Ill.2d 587, 212 Ill.Dec. 437, 657 N.E.2d 638 (1995); *Sampson v. Washington Paint Co.*, 116 Ill.2d 576, 113 Ill.Dec. 317, 515 N.E.2d 126 (1987).

federal courts vests with the United States Congress. U.S. Const. art. III, § 1. Congress also determines and limits the subject matter jurisdiction of the lower federal courts. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 433, 109 S.Ct. 683, 687–88, 102 L.Ed.2d 818 (1989) (citations omitted). Therefore, this court may not hear cases against a foreign sovereign unless Congress grants it the power to do so.

Before 1952, unless the State Department requested otherwise, foreign governments had absolute immunity from being called into United States courts. *Id.* at 434 n. 1, 109 S.Ct. at 688 n. 1 (citation omitted); *see also Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1169 (D.C.Cir.1994), *cert. denied*, 513 U.S. 1121, 115 S.Ct. 923, 130 L.Ed.2d 803 (1995); *Carl Marks & Co. v. Union of Soviet Socialist Republics*, 665 F.Supp. 323, 338 (S.D.N.Y.1987), *cert. denied*, 487 U.S. 1219, 108 S.Ct. 2874, 101 L.Ed.2d 909 (1988). In 1952, the State Department suggested that plaintiffs could sue foreign sovereigns in United States courts for their commercial but not for their governmental acts. *Amerada*, 488 U.S. at 434 n. 1, 109 S.Ct. at 688 n. 1; *Princz*, 26 F.3d at 1169.

■ In 1976, Congress enacted the Foreign Sovereign Immunities Act ("FSIA") which codified this distinction between commercial and governmental acts. The FSIA added a chapter to the United States Code entitled "Jurisdictional Immunities of Foreign States." 28 U.S.C. §§ 1602–1611 (1994).[5] Section 1604 gives foreign countries immunity "from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter." The FSIA also gives the federal district courts sole jurisdiction over contro-versies against foreign sovereigns. § 1330(a).[6] "Sections 1604 and 1330(a) work in tandem: § 1604 bars federal and state courts from exercising jurisdiction when a foreign state is entitled to immunity, and § 1330(a) confers jurisdiction on district courts to hear suits brought by United States citizens ... when a foreign state is not entitled to immunity." *Amerada*, 488 U.S. at 434, 109 S.Ct. at 688. Furthermore, the United States Supreme Court held in *Amerada* "that the FSIA provides the *sole basis* for obtaining jurisdiction over a foreign state in the courts of this country." *Id.* at 443, 109 S.Ct. at 693 (emphasis added); *see also Saudi Arabia v. Nelson*, 507 U.S. 349, 355, 113 S.Ct. 1471, 1476, 123 L.Ed.2d 47 (1993); *Wolf v. Federal Republic of Germany*, 95 F.3d 536, 540–41 (7th Cir.1996), *cert. denied*, — U.S. —, 117 S.Ct. 1112, 137 L.Ed.2d 313 (1997). Consequently, the court must apply the FSIA in every situation involving a foreign sovereign defendant to determine if the court has subject matter jurisdiction to hear the case. *Amerada*, 488 U.S. at 434, 109 S.Ct. at 688 (citation omitted).

Although Congress enacted the FSIA in 1976, courts apply its provisions retroactively to 1952 because it codified provisions that were in effect then. *Carl Marks*, 665 F.Supp. at 339. Consequently, foreign sovereigns after 1952 could reasonably expect to be called into United States courts for claims that resulted from their commercial activity. *Id.; see also Princz*, 26 F.3d at 1170; *Djordjevich v. Bundesminister Der Finanzen*, 827 F.Supp. 814, 816–17 (D.D.C.1993), *aff'd*, 44 F.3d 1031 (D.C.Cir.1994).

The FSIA delineates several exceptions to sovereign immunity. Among the exceptions are (A) implicit or explicit waiver of immuni-

---

**5.** 28 U.S.C. § 1602 states: "Findings and declaration of purpose. The Congress finds that the determination by United States courts of the claims of foreign states to immunity from the jurisdiction of such courts would serve the interests of justice and would protect the rights of both foreign states and litigants in United States courts. Under international law, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned.... Claims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter."

**6.** 28 U.S.C. § 1330(a) states: "The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement."

ty by the foreign state, 28 U.S.C. § 1605(a)(1), (B) commercial activity by the foreign sovereign that results in a claim, § 1605(a)(2), property taken by the foreign state in violation of international law, § 1605(a)(3), (D) a noncommercial tortious act or omission by the foreign state, § 1605(a)(5), and (E) an existing treaty obligation, § 1604. The court treats each of these exceptions separately.

## A. Waiver of Immunity

■ A foreign sovereign is not immune from the jurisdiction of United States courts if it had implicitly or explicitly waived such immunity. § 1605(a)(1).[7] Courts find an implied waiver of immunity only in "narrow and unambiguous" situations. *Drexel Burnham Lambert Group, Inc. v. Committee of Receivers*, 12 F.3d 317, 325 (2nd Cir.1993), *cert. denied*, 511 U.S. 1069, 114 S.Ct. 1644, 128 L.Ed.2d 365 (1994). An implied waiver requires that the foreign sovereign express a willingness to appear in United States courts. *Princz*, 26 F.3d at 1174.

For example, the Fourth Circuit found an implied waiver of sovereign immunity where the Government of Fiji signed a contract that included an express provision to use Virginia law. *Eckert Intl. v. Government of Fiji*, 32 F.3d 77, 82 (4th Cir.1994). And, the Ninth Circuit found an implied waiver where the government of Argentina previously availed itself of the United States courts. *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 720 (9th Cir.1992), *cert. denied*, 507 U.S. 1017, 113 S.Ct. 1812, 123 L.Ed.2d 444 (1993). In *Siderman*, the plaintiff sued Argentina for torture and expropriation of property. *Id.* at 702. After the plaintiff fled to the United States, Argentina attempted to have United States courts enforce a fraudulent criminal

action against him. *Id.* at 703. The Ninth Circuit found this use of United States courts to be sufficient to withstand a motion to dismiss for lack of subject matter jurisdiction. *Id.* at 720.

Sampson asserts that Germany waived its sovereign immunity when it made initial payments to him in 1996. (Pl. Resp. at 3–4.) The reparations payment, however, does not express a willingness by Germany to appear in United States courts. Congress, in enacting the FSIA, said that courts must find a subjective intent by foreign sovereigns to waive immunity. *See Smith v. Socialist People's Libyan Arab Jamahiriya*, 886 F.Supp. 306, 314–15 (E.D.N.Y.1995), *aff'd*, 101 F.3d 239 (1996), *cert. denied*, — U.S. —, 117 S.Ct. 1569, 137 L.Ed.2d 714 (1997). In the instant case, no evidence exists that Germany intended to waive sovereign immunity when it mailed reparations to Sampson.

## B. Commercial Activity

■ A foreign state waives its sovereign immunity when its commercial activity results in a claim. 28 U.S.C. § 1605(a)(2).[8] The FSIA defines "commercial activity" as "a regular course of commercial conduct.... The commercial character of an activity shall be determined by reference to the nature of the course of conduct ..., rather than by reference to its purpose." § 1603(d). When a government acts in a manner consistent with a private company, it is engaged in commercial activity. *Nelson*, 507 U.S. at 360, 113 S.Ct. at 1479 (*citing Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614, 112 S.Ct. 2160, 2166, 119 L.Ed.2d 394 (1992)); *Hirsh v. State of Israel*, No. 95 Civil 9460(JFK), 962 F.Supp. 377, 1997 WL 164287, at *4 (S.D.N.Y. Apr.8, 1997). The government's motive is not material; the de-

---

**7.** 28 U.S.C. § 1605(a)(1) states in full: "A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—(1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver."

**8.** 28 U.S.C. § 1605(a)(2) states in full: "A foreign state shall not be immune from the jurisdiction

of courts of the United States or of the States in any case—(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."

termination of whether a foreign sovereign's acts are commercial depends upon whether its behavior is similar to the actions of private parties engaged in commerce. *Nelson*, 507 U.S. at 360–61, 113 S.Ct. at 1479–80. Consequently, political acts by governments are not commercial activities. *Chicago Bridge & Iron Co. v. Islamic Republic of Iran*, 506 F.Supp. 981, 989 (N.D.Ill.1980). Furthermore, the commercial activity must be regular, substantial, and related to the plaintiff's cause of action. *Id.* at 988; *compare Siderman*, 965 F.2d at 708–10 (commercial activity found where foreign government seized hotel and solicited tourist business for hotel in the United States); *Weltover, Inc. v.. Republic of Argentina*, 941 F.2d 145, 149–153 (2d Cir.1991), *aff'd*, 504 U.S. 607, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) (commercial activity found where foreign government defaulted on bonds in which payments took place in the United States); *with Nelson*, 507 U.S. at 362–63, 113 S.Ct. at 1480–81 (commercial activity not found where government used police and penal powers to resolve a commercial dispute); *Drexel*, 12 F.3d at 330 (commercial activity not found where government confiscated assets in a foreign bank); *Santos v. Compagnie Nationale Air France*, 934 F.2d 890, 891 (7th Cir.1991) (commercial activity not found where sovereign's commercial activity in the United States was not related to the claim).

■■■■ A commercial act by a sovereign that occurs outside the United States must cause a direct, substantial, and foreseeable consequence within the United States to abrogate immunity. *Chicago Bridge*, 506 F.Supp. at 989 (citation omitted); *see also Princz*, 26 F.3d at 1172; *Siderman*, 965 F.2d at 710. However, the plaintiff's citizenship does not provide sufficient contact to invoke jurisdiction. *Djordjevich*, 827 F.Supp. at 817; *Chicago Bridge*, 506 F.Supp. at 988.

Although Sampson alleges that Germany's reparations payments to him are commercial activity, (*see* Pl. Resp. at 3–4), other plaintiffs, in similar situations, have not been successful at making this argument. For example, the Seventh Circuit in *Wolf* held that payments by Germany to Holocaust survivors did not constitute commercial behavior. 95 F.3d at 543–44; *see also Hirsh*, 962 F.Supp. 377, 382–83 ("It is difficult to conceive of activities more quintessentially governmental that the payment of reparations to Holocaust survivors pursuant to a treaty between two nations"). Sampson does not allege any other commercial activities by Germany that could waive immunity. Therefore, he cannot use commercial activity to abrogate Germany's sovereign immunity.

## C. Property Exception

■■■■ A foreign sovereign loses its immunity if it takes property in violation of international law. 28 U.S.C. § 1605(a)(3).[9] Furthermore, "property" under this section refers to tangible property. *Hirsh*, 962 F.Supp. 377, 382–83. Therefore, under the FSIA, the right to receive payments does not constitute property. *Id.* Sampson does not allege any loss of tangible property. Consequently, even if Sampson can prove a right to receive payments, this right would not abrogate Germany's sovereign immunity.

## D. Noncommercial Tort

■■■■ A foreign sovereign abrogates its immunity when its noncommercial acts or omissions cause personal injury, death, or damage or loss to property. 28 U.S.C. § 1605(a)(5).[10] The act that causes the damage must occur in the United States. *Amerada*, 488 U.S. at 440, 109 S.Ct. at 691; *Wolf*, 95 F.3d at 542. "[M]ere injurious conse-

**9.** In pertinent part 28 U.S.C. § 1605(a)(3) states: "A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—(3) in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state. . . ."

**10.** In pertinent part 28 U.S.C. § 1605(a)(5) states: "A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—(5) not otherwise encompassed in paragraph (2) above [commercial activity], in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state. . . ."

quences within the United States based on an act or omission outside the country [do] not result[] in jurisdiction over foreign defendants." *Chicago Bridge,* 506 F.Supp. at 990; *see also Wolf,* 95 F.3d at 542; *Princz,* 26 F.3d at 1173 ("The lingering effects of a personal injury suffered overseas cannot be sufficient to satisfy the direct effect requirements of the FSIA").

A liberal interpretation of Sampson's complaint includes two tort allegations. (*See* Am. Compl. ¶¶ 3, 5, 6.) He alleges tortious acts (1) by Germany during his imprisonment in a Nazi concentration camp and (2) by Germany's failure to give him proper reparations. *Id.* Although some effects of these actions arguably occurred in the United States, the alleged tortious acts occurred elsewhere. Sampson was imprisoned in Poland, and the decisions over reparations to Holocaust survivors took place in Germany. (*Id.* ¶ 6; Compl. ¶ 9–10.) In *Wolf,* the Seventh Circuit faced similar facts and could find no tortious act that took place in the United States. 95 F.3d at 542–43. Irving Wolf was an 81–year–old Holocaust survivor. *Id.* at 538. Wolf had pursued reparations from Germany since the 1950s and allegedly received payments totaling DM 1800, which made him ineligible for any award under the Hardship Fund.[11] *Id.* at 540. Wolf filed an action against both the Claims Conference and Germany to secure a pension from the Hardship Fund. *Id.* The *Wolf* court found that the failure to make reparations took place in Germany. *Id.* at 542. Furthermore, even if Holocaust survivors are third party beneficiaries of the agreements between Germany and the Claims Conference, the *Wolf* court found that the defendants did not breach any of these agreements. *Id.* at 542–43.

Sampson alleges that Germany committed a breach of covenant and bad faith. (Am. Compl.¶ 4–5.) This court, however, cannot find any evidence of a contract or agreement between Germany and Sampson.[12] And, even if the court found that Sampson was a

third party beneficiary of the agreements between the Claims Conference and Germany and that a tort occurred in the United States, the court does not find that the defendants breached any of their agreements. The Claims Conference and Germany entered into Protocol No. 1 in 1952 to offer restitution to Jewish survivors of the Nazi era. (*See* Claims Conference Ex. 4.) Germany agreed to follow the goals of the agreement expeditiously. (*Id.*) It did so by enacting the German Federal Indemnification Law in 1953. (Conf. Mem. Supp. Mot. to Dismiss at 3.) Germany administered this fund without assistance from the Claims Conference. (*Id.*)

The defendants also entered into Protocol No. 2 in 1952, which acknowledged that individual restitution to all Nazi victims was impossible. Therefore, Germany promised to pay Israel DM 450 million to benefit the Claims Conference. (Conf.Ex. 6.) The Claims Conference used this fund for the "relief, rehabilitation and resettlement" of Jewish Holocaust survivors living outside of Israel. (*Id.* Ex. 6, Art. 2.) Protocol No. 2 stipulates that all disputes will be resolved by an Arbitral Commission established by Israel and Germany. (*Id.* Ex. 6, Art. 4.)

Furthermore, in 1980, Germany established the Hardship Fund to provide a one-time payment of DM 5000 to Jewish victims of Nazi violence who had not already received compensation. (*Id.* Ex. 8.) Finally, in 1990, Germany established the "Article 2" fund that provided hardship payments to individuals who had received minimal or no compensation under the prior reparations programs. Besides receiving a one-time payment, Article 2 beneficiaries receive an ongoing payment of DM 500 per month. (*Id.* Ex. 9.)

None of these agreements promises to pay every Nazi victim a certain amount of money. *See Wolf* 95 F.3d at 542. In fact, the Hardship Fund states that "[n]o right of action to receive compensation is hereby created," (*id.*

---

**11.** See Background and infra this section for a description of the Hardship Fund.

**12.** Although Sampson states that the defendants "recognized but consistently failed to live up to

their promises of full compensation," (Pl.'s Resp. to Mot. Dismiss Am. Compl. at 3), the court finds no evidence to support this allegation.

Ex. 8, ¶ 3), and the Article 2 fund stipulates that "[t]here is no legal claim to payments provided according to this agreement," (*id.* Ex. 9, Part IV, ¶ 2).

Sampson first applied for reparations from Germany in 1948. (Compl.¶ IX.) In 1981, he applied for restitution under the Hardship Fund. (*Id.*) Both requests "were ignored." (*Id.*) The Claims Conference approved his request for Article 2 funds in February 1996. (*Id.* Ex. 1.) He received a lump-sum payment of DM 5000 and is eligible for monthly payments of DM 500 retroactive to August 1995. (*Id.* Ex. 1; Conf. Mem Supp. Mot. to Dismiss at 6.)

Sampson claims that these payments are insufficient and that defendants embezzled money and illegally diverted funds to "Gestapo murderers." (Am.Compl.¶ V.) Even if the court found that these allegations were accurate, the alleged torts did not take place in the United States. None of the reparation agreements took place here. The payments are mailed from Germany. (Claims Conference Mem. Supp. Mot. to Dismiss at 5.) Any diversion or embezzlement of funds would have taken place in Germany. Furthermore, Germany has not committed to making certain payments to Sampson or any other specific Holocaust survivor. Consequently, Sampson's tort claim does not meet the FSIA's noncommercial tort exception for abrogating sovereign immunity.

### E. Existing Treaty Obligation

 The FSIA waives sovereign immunity if an existing international agreement contradicts the terms of the FSIA. 28 U.S.C. § 1604.[13] To abrogate sovereign immunity, the international agreement must expressly state its intention to do so. *Amerada,* 488 U.S. at 442–43, 109 S.Ct. at 692–93; *Frolova v. Union of Soviet Socialist Republics,* 761 F.2d 370, 378 (7th Cir.1985); *see also Princz,* 26 F.3d at 1175; *Siderman,* 965 F.2d at 720. Furthermore, the international agreement must infer a private cause of action. *Amerada,* 488 U.S. at 442, 109 S.Ct. at 692–93;

*Frolova,* 761 F.2d at 373; *see also Princz,* 26 F.3d at 1175; *Smith,* 886 F.Supp. at 310. While non-binding United Nations resolutions are not enforceable under the FSIA, binding ones are if they contain an express waiver of immunity. *Siderman,* 965 F.2d at 719–20; *Smith,* 886 F.Supp. at 311.

 Sampson argues that the United States signature on the United Nations Convention on the Prevention and Punishment of the Crime of Genocide ("Genocide Convention") precludes Germany's claim of sovereign immunity. (Am.Compl.¶ IV.) The United Nations enacted the Genocide Convention in 1951 as a *resolution* to make "genocide . . . a crime under international law." (*Id.* Attach. 5.) The signatories agreed to "enact . . . necessary legislation . . . to provide effective penalties for persons guilty of genocide." (*Id.* Attach. 5, Art. 5.) Furthermore, the Genocide Convention calls for "[p]ersons charged with genocide . . . [to] be tried by a competent tribunal of the State in the territory of which the act was committed, or by such international penal tribunal as may have jurisdiction with respect to those Contracting Parties which shall have accepted its jurisdiction." (*Id.* Art. 6.)

For several reasons, the Genocide Convention does not abrogate Germany's immunity. First, it is a non-binding resolution that does not contain an express provision or intent to waive sovereign immunity. Second, it does not promulgate a cause of action for private citizens; it calls on the *"Contracting Parties* [nations] . . . to prevent and to punish" genocide. (*Id.* Art. 1. (emphasis added).) Finally, under the Genocide Convention, the United States cannot exercise jurisdiction for genocide that occurs outside its territory. (*Id.* Art. 6.)

 To satisfy the intent of the Genocide Convention, the United States Congress promulgated the Genocide Convention Implementation Act of 1987 (the "Proxmire Act"). 18 U.S.C. § 1091 (1994). Genocide, under the Proxmire Act, is punishable by death or imprisonment. § 1091(a)-(b). The Act ap-

---

**13.** 28 U.S.C. § 1604 states in full: "Immunity of a foreign state from jurisdiction. Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter."

plies to genocide committed either within the United States or by a United States national. § 1091(d). Sampson does not allege that any genocide was committed in the United States or by a United States national. Therefore, the Proxmire Act does not apply and the court finds no treaty obligations that abrogate Germany's immunity. Consequently, this court does not have subject matter jurisdiction over Germany because (A) Germany did not waive immunity, (B) it did not engage in commercial activity, it did not take property in violation of international law, (D) it did not commit a noncommercial tort, and (E) its immunity is not abrogated by an international treaty. The court grants Germany's motions to dismiss both Sampson's original complaint and amended complaint.[14]

## II. CLAIMS CONFERENCE

Sampson's claims against the Claims Conference include violation of civil rights, breach of covenant, and embezzlement of funds. (*See* Am. Compl. ¶¶ 3–5.) In order for Sampson to withstand a motion to dismiss by the Claims Conference, he must show that he has standing. "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute...." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Furthermore, "[s]tanding is a jurisdictional issue which concerns power of federal courts to hear and decide cases and does not concern ultimate merits of substantive claims involved in the action." *Black's Law Dictionary* 1405 (6th ed.1990) (citation omitted). Sampson must show "that he had a legally protected interest that the Claims Conference invaded." *Wolf,* 95 F.3d at 544 (*citing Warth,* 422 U.S. at 500, 508, 95 S.Ct.

at 2205–06, 2210) (other citations omitted). If Sampson does not have a legally protected right, he cannot state a claim upon which relief can be granted. *Id.; see also Revici v. Conference of Jewish Material Claims Against Germany Inc.,* 11 Misc.2d 354, 174 N.Y.S.2d 825, 827 (Sup.Court.1958).

The Claims Conference is a nonprofit international coalition of twenty-three Jewish organizations. (Claims Conference Mem. Supp. Mot. to Dismiss at 3.) For more than forty years it has held discussions with Germany concerning reparations for Jewish Holocaust survivors. (*Id.*) In 1952, defendants entered into agreements known as Protocol No. 1 and Protocol No. 2. (*Id.*) In 1980 they established the Hardship Fund. (*Id.* at 4.) Finally, in 1990 they established the Article 2 Fund. (*Id.* at 5.)[15] The Claims Conference did not administer any of the funds payable under Protocols No. 1 or No. 2. (*Id.* at 3–4.) The Claims Conference's role in administering the Hardship and Article 2 Funds is limited to "reviewing whether applicants for such payments meet the clearly-defined qualifications set forth by Germany. The Claims Conference does not have, and has never had, any decision-making or discretionary authority with respect to benefits for claimants." (*Id.* at 1; *see also id.* at 5; *id.* Ex. 3 at 2–3.) Furthermore, neither the Hardship Fund nor the Article 2 Fund grants any rights for particular claimants to receive any funds. (*Id.* at 5.)[16]

Sampson alleges that defendants embezzled funds violating 18 U.S.C. § 664 (1994). This federal statute, however, applies to theft or embezzlement from employee benefit plans.[17] Sampson is not an em-

---

**14.** Sampson also moves this court to certify the sovereign immunity question to the United States Supreme Court under Rule 19 of the Supreme Court Rules. (Pl.'s Resp. to Mot. Dismiss Am. Compl. at 5.) Rule 19, however, states that "[a] United States *court of appeals* may certify to [the Supreme Court] a question or proposition of law on which it seeks instruction for the proper decision of a case." Sup.Ct. R. 19 (emphasis added); *see also,* 28 U.S.C. § 1254(2). Consequently, this District Court does not have the authority to honor Sampson's request.

**15.** For a more detailed discussion of Protocols Nos. 1 and 2, the Hardship Fund, and the Article 2 fund, see supra section I(D).

**16.** The Hardship Fund states that "[n]o right of action to receive compensation is hereby created." (*Id.* Ex. 8, ¶ 3.) The Article 2 Fund states that "[t]here is no legal claim to the payments provided according to this agreement." (*Id.* Ex. 9, Part IV, ¶ 2.)

**17.** 18 U.S.C. § 664 states in full: "Theft or embezzlement from employee benefit plan. Any person who embezzles, steals, or unlawfully and wilfully abstracts or converts to his own use or to

ployee of the Claims Conference, and the alleged embezzlement did not take place from an employee benefit plan.

Sampson's allegations of civil rights violations are difficult to comprehend. He introduced no specific allegations to show, and this court cannot fathom, how an international coalition of Jewish organizations conspired with Germany to infringe the civil rights of a Jewish Holocaust survivor. Without some well-pleaded facts, this court cannot find a conspiracy or a violation of Sampson's civil rights.

Sampson does not have standing to sue the Claims Conference because he has not established that any personal rights exist in the agreements between Germany and the Claims Conference. Therefore, Sampson does not have any claims to pursue. Consequently, the court grants the Claims Conference's motions to dismiss Sampson's original complaint and amended complaint.

## III. OTHER ARGUMENTS BY DEFENDANTS

Both defendants claim that their motions to dismiss are supported by the act of state doctrine and the statute of limitations. Although the court has already found that Germany's motion to dismiss is supported by FSIA, and the Claims Conference's motion to dismiss is supported by Sampson's lack of standing, the court will briefly review the act of state doctrine and the statute of limitations.

### A. Act of State Doctrine

The United States Supreme Court established the act of state doctrine in 1897 when it held that "[e]very sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of government of another done within its

own territory." *Underhill v. Hernandez*, 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897). The act of state doctrine presumes that the official public acts of a foreign country are valid. *W.S. Kirkpatrick & Co. v. Tectonics Corp.*, 493 U.S. 400, 409, 110 S.Ct. 701, 706–07, 107 L.Ed.2d 816 (1990); *F. & H.R. Farman–Farmaian Consulting Eng'rs Firm v. Harza Eng'g Co.*, 882 F.2d 281, 283 (7th Cir.1989), *cert. denied*, 497 U.S. 1038, 110 S.Ct. 3301, 111 L.Ed.2d 809 (1990); *Wolf v. Federal Republic of Germany*, No. 93 C 7499, 1995 WL 263471, 1995 U.S. Dist. LEXIS 5860, at *32 (N.D.Ill. Apr. 27, 1995), *aff'd*, 95 F.3d 536 (7th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1112, 137 L.Ed.2d 313 (1997). The doctrine, however, does not apply to the commercial activities of a sovereign State. *Alfred Dunhill, of London Inc. v. Republic of Cuba*, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976). Furthermore, the act of state doctrine is irrelevant if the court does not have subject matter jurisdiction. *Siderman*, 965 F.2d at 706. Therefore, if the FSIA precludes subject matter jurisdiction, the act of state doctrine does not create a cause of action. *Id.*

The act of state doctrine protects both defendants. Even if the FSIA allowed jurisdiction over Germany, the act of state doctrine would protect Germany from Sampson's suit. Germany's agreements with the Claims Conference are all official, public acts by a sovereign. They are not commercial activities. Furthermore, the act of state doctrine also protects the Claims Conference. Its authority to administer the funds is based upon Germany's official acts and German law. Sampson does not allege that the Claims Conference deviated from any of the fund requirements as delineated in the various agreements between defendants.[18]

United States courts can exercise jurisdiction over foreign sovereigns when the extraterritoriality exception defeats the act

the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare plan or employee pension benefit plan, or of any fund connected therewith, shall be fined under this title, or imprisoned not more than five years, or both.

"As used in this section, the term 'any employee welfare benefit plan or employee pension ben-

efit plan' means any employee benefit plan subject to any provision of title I of the Employee Retirement Income Security Act of 1974."

18. For a more detailed discussion of the fund agreements between Germany and Claims Conference see supra sections I(D) and II.

of state doctrine. This exception applies when a foreign sovereign, exercising official powers, confiscates property outside of its own territory. *Harza,* 882 F.2d at 283; *Wolf,* 1995 WL 263471 1995 U.S. Dist. LEXIS 5860, at *35–36. The only property that Sampson can claim was confiscated by the defendants within the United States is the alleged debt they owe to him. Nevertheless, courts have been unwilling to find the situs of a debt in any particular place. *Harza,* 882 F.2d at 286. Furthermore, Sampson alleges a conspiracy between defendants to deprive him of reparations. He has not alleged any unilateral acts by the Claims Conference to deprive him of any money entitled to him under the agreements. Therefore, the alleged conspiracy must be the agreements between the defendants. None of the agreements, however, took place in the United States. Consequently, the confiscation did not take place in the United States, and the act of state doctrine precludes United States courts from questioning Germany's official acts.[19]

### B. Statute of Limitations

 Both defendants argue that Sampson's claims are barred by the statute of limitations. If a federal claim does not contain its own statute of limitations, the court uses the appropriate local statute of limitations. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 359, 111 S.Ct. 2773, 2780, 115 L.Ed.2d 321 (1991); *Tolle v. Carroll Touch, Inc.,* 977 F.2d 1129,

1137 (7th Cir.1992) (citations omitted). None of Sampson's alleged federal claims against defendants contains its own statute of limitations.[20] Therefore, the court uses the appropriate Illinois statute of limitations.[21]

 Several different statutes of limitation are possible for Sampson's claims. On a personal injury claim, the statute of limitations period is two years. 735 ILCS 5/13–202 (West 1992). For a breach of a written contract, the statute of limitations is ten years. § 13–206. For a breach of an oral contract, or for other civil actions without an express time period, the statute of limitations is five years. § 13–205.

If Sampson's claim is for personal injury due to his incarceration in Nazi concentration camps, then his injuries accrued in 1945 when they released him. Even under Illinois' catchall statute, § 13–205, the statute of limitations expired in 1950. If Sampson's claim is for breach of contract, however, then the ten-year statute of limitations applies because the agreements between defendants are written. Sampson applied for restitution in 1948 in Hannover and in 1981 to the Hardship Fund. (Compl.¶ IX.) He claims that they ignored his requests. (*Id.*) Even allowing for a two-year period to pass before he could expect an answer, the statute of limitations expired in 1960 for his request in Hannover and in 1993 for his request under the Hardship Fund.

Sampson also applied under the Article 2 fund and received a reply in February 1996.

---

**19.** Although Sampson correctly states that the Claims Conference is a New York Corporation, (Pl.'s Resp. to Mot. Dismiss Am. Compl. at 7), the act of state doctrine applies to the acts of a sovereign, in this case Germany, not to the unilateral acts of a corporation. Therefore, the doctrine applies to Germany's official acts, either unilaterally or in its agreements with the Claims Conference, none of which took place in the United States.

**20.** Plaintiff Sampson correctly indicates that the crime of genocide under the Proxmire Act does not have a limitations period. (Mem. Supp. Am. Compl. ¶ VII; 18 U.S.C. § 1091(e).) However, because the Proxmire Act only applies to acts of genocide within the United States or by a national of the United States, the court will not address it in this section. (*See* § 1091(d); *see also* discussion supra at I(E)).

**21.** Defendant Claims Conference would have the court use Germany's tort statute of limitations. (Claims Conference Mem. Supp. Mot. to Dismiss at 13.) Illinois' foreign limitations statute reads: "When a cause of action has arisen in a state or territory out of this State, or in a foreign country, and, by the laws thereof, an action thereon cannot be maintained by reason of the lapse of time, an action thereon shall not be maintained in this State." 735 ILCS 5/13–210 (West 1992). This statute, however, applies when neither party resides in Illinois. *Caraluzzi v. Prudential Securities, Inc.*, 824 F.Supp. 1206, 1213 (N.D.Ill.1993) (citing *LeBlanc v. G.D. Searle & Co.,* 178 Ill. App.3d 236, 127 Ill.Dec. 423, 424, 533 N.E.2d 41, 42 (1988)). Since Sampson resides in Illinois, this statute does not apply.

(*Id.* Attach.) The statute of limitations for this request does not expire for ten years under § 13–206, or until 2006. However, because he is receiving the maximum amount under this fund, DM 5000 in a lump-sum payment and DM 500 per month, he does not have a cause of action against defendants. (*Id.;* Claims Conference Mem. Supp. Mot. to Dismiss Ex. 9, Part II.) Therefore, though the statute of limitations has not run on an Article 2 claim, Sampson's failure to state a claim supports defendants' motions to dismiss.

## IV. OTHER CLAIMS BY SAMPSON

 *Pro se* Plaintiff Sampson makes four other claims in his complaints that the court will now address.[22] First, he claims that "universal jurisdiction" gives this court subject matter jurisdiction over Germany. (Compl. ¶ VI; Mem. Supp. Am. Compl. at 5.) He cites *United States v. James–Robinson,* 515 F.Supp. 1340 (S.D.Fla.1981) as authority. Universal jurisdiction applies, however, to a foreign *national* not to a foreign *sovereign. Id.* at 1344 n. 6.

Universal jurisdiction can also be thought of as violations of *jus cogens* norms of international law. "A *jus cogens* norm is a principle of international law that is 'accepted by the international community of States as a whole as a norm from which no derogation is permitted....'" *Princz,* 26 F.3d at 1174 (*quoting* Vienna Convention on the Law of Treaties, May 23, 1969, art. 53, U.N. Doc. A/Conf. 39/27, 8 I.L.M. 679).

 Sampson accuses Germany of the "brutal murder of 60 members of [his] family and for damages and injuries he sustained while prisoner in concentration camps." (Pl.'s Resp. to Mot. Dismiss Am. Compl. at 3.) The court agrees that Nazi Germany's behavior violated a *jus cogens* norm. Nevertheless, a violation of a *jus cogens* norm is not sufficient to abrogate sovereign immunity under the FSIA. *Siderman,* 965 F.2d at 718–19 (finding that the Supreme Court's holding in *Amerada,* 488 U.S. at 436, 109 S.Ct. at 689, requires that Congress explicitly include violations of *jus cogens* norms if it is to abrogate sovereign immunity). Furthermore, violations of *jus cogens* norms do not infer a waiver of sovereign immunity. *Frolova,* 761 F.2d at 377; *Princz,* 26 F.3d at 1174; *Smith,* 886 F.Supp. at 314–15. Consequently, even if we were to find that Germany violated a *jus cogens* norm in its treatment of Sampson, we would still not have subject matter jurisdiction under FSIA.[23]

Second, Sampson claims that defendants violated the Statute of Frauds. (Plaintiff.'s Resp. to Claims Conference at 1; Mem. Supp. Am. Compl. at 5.) The Statute of Frauds requires certain types of agreements to be in writing. E. Allan Farnsworth, *Contracts* §§ 6 .1–6.2 (2d ed.1990); *see also Black's Law Dictionary* 457 (abr. 6th ed.1991). Because a party who does not want an agreement enforced usually brings the Statute of Frauds, Farnsworth at § 6.10, determining Sampson's purpose in highlighting this statute in his complaint is difficult. Furthermore, all of the relevant agreements between defendants—Protocols No. 1 and 2, the Hardship Fund, and the Article 2 Fund—were all in writing and therefore, satisfy the Statute of Frauds.

 Third, Sampson claims that the Declaratory Judgment Act confers subject matter jurisdiction over defendant Germany. (Pl.'s Resp. to Germany at 2; Mem. Supp. Am. Compl. at 6.) The Declaratory Judgment Act authorizes courts to hear cases that determine rights without seeking any relief. 28 U.S.C. § 2201(a) (1994).[24] Nevertheless, the

---

**22.** In addition, Sampson apparently wants to re-address the issue of recusal. (Pl.'s Resp. to Mot. Dismiss Am. Compl. at 1.) This court dismissed the plaintiff's motion for disqualification on May 21, 1997. Furthermore, Chief Judge Marvin E. Aspen denied Sampson's motion to intervene in the disqualification motion on June 18, 1997 stating that "[a]ny relief from Judge Williams' decision on the motion for recusal must come from the Circuit Court of Appeals." (Minute Order of June 18, 1997.)

**23.** For a more complete discussion of FSIA, see *supra* section I.

**24.** The pertinent parts of 28 U.S.C. § 2201(a) state: "Creation of remedy. (a) In a case of actual controversy within its jurisdiction ..., any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration

Declaratory Judgment Act does not extend the court's jurisdiction; it simply enlarges the remedies available to the court. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671, 70 S.Ct. 876, 878–79, 94 L.Ed. 1194 (1950); *see also Allendale Mutual Ins. Co. v. Bull Data Systems, Inc.*, 10 F.3d 425, 431 (7th Cir.1993). Congress restricted the jurisdiction of federal courts over foreign sovereigns with the FSIA; filing a declaratory judgment claim does not alter the court's lack of subject matter jurisdiction in this case.

Finally, Sampson claims that defendants embezzled funds intended for Jewish Holocaust survivors. (Pl.'s Resp. to Germany at 1, 3; Pl.'s Resp. to Claims Conference at 1–3; Am. Compl. ¶¶ III, V, IX; Mem. Supp. Am. Compl. at 8.) Embezzlement "in general may be defined as the fraudulent conversion of the property of another by one who is already in lawful possession of it." Wayne R. LaFave and Austin W. Scott, Jr., *Criminal Law* § 8.6 (2d ed.1986). While embezzlement is a criminal offense, it is similar to the common law tort of conversion. Conversion is "[a]n unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of the owner's rights." *Black's Law Dictionary* 231 (abr. 6th ed.1991).

The only facts Sampson offers to support his claim come from a newspaper article that states that the "Claims Conference has now become the owner of hundreds of properties in Germany and laid claim to tens of thousands more." (Am.Compl.Attach.4.) Nevertheless, nowhere in the article or in Sampson's complaints is it alleged that the Claims Conference or Germany converted any of *Sampson's* property.[25] Therefore, the claim

of embezzlement, or conversion, does not state a claim upon which relief may be granted.

### *Conclusion*

For the foregoing reasons, Defendants' Motions to Dismiss Plaintiff Sampson's Original Complaint and Amended Complaint are granted.

---

shall have the force and effect of a final judgment or decree and shall be reviewable as such."

25. Sampson includes another article from the same publication that arguably hurts his position. (Pl.'s Resp. to Mot. Dismiss Am. Compl. App. 3.) This article reiterates that the Claims Conference's responsibility is to help Holocaust survivors not "inheritance chasers" who "charge as much as 50 percent of the profits for their services." (*Id.*) Certainly Sampson would agree

that the Claims Conference funds should go to Holocaust survivors and not to "lawyers and brokers looking for heirs." (*Id.*) Furthermore, the article concludes that "[n]obody suggests that the Claims Conference is doing anything but good work with its money. Between 1995 and 1996 alone, it allocated DM 83.8 million from the proceeds of restituted properties, 80 percent earmarked for shelter and social service projects to elderly Holocaust survivors." (*Id.*)