**Irving WOLF, Plaintiff–Appellant,**

v.

**FEDERAL REPUBLIC OF GERMANY and The Conference on Jewish Material Claims Against Germany, Inc., Defendants–Appellees.**

No. 95–3247.

United States Court of Appeals, Seventh Circuit.

Argued March 27, 1996.

Decided Sept. 5, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied
Oct. 1, 1996.

538

Mark I. Dunaevsky (argued), Evanston, IL, for Plaintiff-Appellant.

Michael D. McCormick, Coffield, Ungaretti & Harris, Chicago, IL, Thomas G. Corcoran, Peter Heidenberger (argued), Berliner, Corcoran & Rowe, Washington, DC, for Defendant-Appellee Federal Republic of Germany.

Julius Berman, Kaye, Scholer, Fierman, Hays & Handler, New York City, Douglas P. Dehler, Michael, Best & Friedrich, Milwaukee, WI, Daniel A. Kaufman (argued), Paul J. Cherner, Michael, Best & Friedrich, Chicago, IL, for Defendant-Appellee Conference of Jewish Material Claims Against Germany, Inc.

Before EASTERBROOK, KANNE, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Irving Wolf is an 81 year old survivor of the Holocaust. He brought this action against the Federal Republic of Germany and the Conference on Jewish Material Claims Against Germany, Inc. (the "Claims Conference"), claiming that they have wrongfully refused to pay him reparations from certain funds established for victims of Nazi Germany. The district court dismissed the complaint against Germany and granted summary judgment for the Claims Conference, finding in essence that the federal courts were not the right place for Wolf to pursue his claims. See *Wolf v. Federal Republic of Germany*, 1995 WL 263471 (N.D.Ill. 1995). In spite of our genuine sympathy for the unspeakable ordeal that Wolf endured, we agree that the district court properly ruled for the defendants, and we therefore affirm the judgment below.

## I

### A. Wolf's Persecution by Nazi Germany

Wolf was born in Chust, Czechoslovakia, in 1915 and moved to the Sudetenland in 1935, where he became a successful buyer and trader in metal scraps and rags. In 1938, Nazi Germany annexed the Sudetenland, and they confiscated Wolf's property (among that of many others). Having lost all of his business contacts and wealth, Wolf returned to Czechoslovakia and joined the Czech army. When the Nazis invaded Czechoslovakia in 1939, they captured Wolf and returned him to his hometown of Chust under quarantine, as a prisoner of war. The next year, the Nazis imposed anti-Jewish laws in Czechoslovakia, which impelled Wolf to assume the new surname Farkash. Nevertheless, he was still singled out among the other prisoners of war as Jewish, and in 1941, he was sent to the Nazi labor camp of Shar Bogard, where he was treated inhumanely. In 1942, he was briefly released from Shar Bogard, but he was soon ordered to return there. Although he tried to evade the order by going into hiding, he was soon recaptured and sent to Marko Prison, where he stayed for a year. He was then moved to another labor camp, and six months later was returned to Marko Prison until the fall of 1943. The next stop was Gorony–Ditaw detention camp, from which he escaped. The worst was yet to come: in the spring of 1944, Wolf and his family were captured and sent to Auschwitz–Birkenau. There his mother, father, and sister were murdered. Wolf was assigned to Birkenau, and then was sent to the slave labor camp Shventocholovitz. His treatment at both Auschwitz–Birkenau and Shventocholovitz was brutal, and he continues to suffer from the effects of the beatings he received. Finally, the Nazis sent him to Mauthausen in early April 1945, where he again was forced to work as a slave. In May 1945, American forces liberated Mauthausen.

Wolf emigrated to the United States in June 1946 and became an American citizen soon thereafter.

## B. The German Compensation Funds

On September 10, 1952, representatives of the Claims Conference (a not-for-profit corporation that represents 24 Jewish organizations worldwide) and of Germany entered into Protocol No. 1, under which Germany resolved to supplement and amend its existing compensation legislation to ensure that all who had suffered under the Nazi regime would receive the most favorable treatment available under the law. It did so both through improving its system of compensation payments and by enacting laws regarding restitution of property to victims of Nazi persecution. Pursuant to the First Protocol, Germany enacted the Bundesentschadigungsgesetz (BEG), or Federal Indemnification Law, in 1953, which provided for the promised payments.

On the same day, Germany and the Claims Conference also entered into Protocol No. 2, which recognized that in many cases restitution and indemnification for Nazi victims were impossible as a practical matter. In the Second Protocol, Germany therefore undertook

> the obligation towards the Conference on Jewish Material Claims against Germany, to enter, in the Agreement with the State of Israel, into a contractual undertaking to pay the sum of 450 million Deutsche Mark [sic] to the State of Israel for the benefit of the Conference on Jewish Material Claims against Germany.

Second Protocol, Art. 1. The Second Protocol also specified that Germany would discharge its obligation by paying the agreed sum to the State of Israel, pursuant to its treaty with Israel, and that:

> [t]he amount so paid and transmitted by the State of Israel to the [Claims Conference] will be used for the relief, rehabilitation and resettlement of Jewish victims of National Socialist persecution, according to the urgency of their needs as determined by the [Claims Conference]. Such amounts will, in principle, be used for the benefit of victims who at the time of the

conclusion of the present Agreement were living outside of Israel.

Second Protocol, Art. 2. Article 4 of the Second Protocol stated that disputes arising out of the interpretation and application of Article 2 would be decided in accordance with the arbitral provisions of the Agreement between Israel and Germany.

The Agreement between Israel and Germany referenced in the Protocols was also signed on September 10, 1952. It provided for a payment from Germany to Israel of DM 3 billion, in addition to the 450 million mentioned in the Second Protocol (to which the Agreement expressly referred). The remainder of the Agreement set forth payment terms, commodities and services to be furnished to Israel, and administrative machinery for its implementation, including in Article 14 the arbitral procedure alluded to in the Second Protocol.

Although Germany carried out its obligations under the First and Second Protocols and the Agreement with Israel, by 1980 it appeared that some people had fallen between the cracks. Germany accordingly created the Hardship Fund in a set of guidelines issued on October 3, 1980. The Hardship Fund was expressly designed for Jewish victims of "national socialist violence ... who for formal reasons did not obtain compensation." See 1980 Guidelines, Appellant's Appendix at A79. Those formal reasons included the inability to file an application in time or meet the requirements of deadlines or residence provided in the 1953 Indemnification Law. The 1980 Guidelines, § 3, expressly stated that "[n]o right of action to receive compensation is hereby created." Benefits could go as high as DM 5,000 under the Hardship Fund.

After German reunification in 1990, yet another fund was created for persecutees, pursuant to Article 2 of the German Unification Agreement. This "Article 2 Fund" was somewhat more flexible than the Hardship Fund of 1980, in that it provided for "hardship payments to individuals who are persecutees in the meaning of paragraph 1 of the Federal Indemnification Law (BEG) who have received to date minimal or no

compensation, pursuant to the legislation of the German Federal Republic." Qualified individuals (those who can prove they were incarcerated for at least six months in a concentration camp, or who satisfy similar criteria) are eligible to receive a one time "bridging payment" (up to DM 10,000) and an ongoing monthly payment of DM 500 beginning on August 1, 1995. Payments from the Article 2 Fund are made by the Claims Conference's office in Frankfurt, Germany, once that office determines that an applicant meets the requirements set forth by Germany in its laws and regulations. Like the 1980 Hardship Fund, the Article 2 Fund Guidelines (part IV, para. 2) state that there is no legal claim to payments provided under the Reunification Agreement.

## C. Wolf's Efforts to Obtain Compensation

Some time in the late 1950s, Wolf (by then living in the Chicago area) hired a law firm to pursue his claim for reparations and indemnification. Dissatisfied with its work, he dismissed the firm in 1961. In July 1963, a German attorney hired by the firm pursued a disability claim on Wolf's behalf and secured a judgment of DM 600 (about $80 at the time) for injuries Wolf had suffered at Shventocholovitz. Wolf claimed that the German attorney had no authority to act on his behalf, and he returned the check for DM 600 on September 12, 1963. Wolf then hired another German lawyer to pursue his appeal of the decision awarding him DM 600. The final appeal in this case came before the German Higher Regional Court on December 17, 1968, but because Wolf's attorney failed to appear, his claim was not heard. Wolf hired a third German lawyer to pursue his claims, but to no avail.

In 1986, Wolf applied to the Claims Conference for payment from the Hardship Fund. On March 22, 1988, the Claims Conference denied his application. It had been advised by the Restitution Office in Saarburg—an arm of the German government—that Wolf had received compensation in the amount of DM 1,800 "by decision of May 16, 1960." Appellant's Appendix at A225 (English translation). Even a payment as small as DM 1,800 rendered Wolf ineligible for an award under the Hardship Fund. Grants from the Fund could only be made if no indemnification payment, regardless of the amount, had been received by the applicant. Wolf, however, strenuously contested that he had ever received any payment of DM 1,800, or any other amount, in indemnification. Finally, on February 16, 1993, Wolf filed an application for payment from the Article 2 Fund which, as noted above, was available to claimants who had previously received "minimal" payments. That application, as far as the record shows, is still pending before the Claims Conference.

On December 13, 1993, Wolf filed this action with the district court, claiming that he should have been granted a pension under the Hardship Fund. That court, as already noted, ruled against Wolf. It found that Germany was immune from suit under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602–11, and that the act of state doctrine barred the court from judging the validity of the decisions of the German government relating to Wolf's claims. With respect to the Claims Conference, the court found that Wolf had no standing to sue, that he stated no claim against the Conference, and that the act of state doctrine barred this action as well.

## II

Although there are some facts that the parties dispute hotly, such as the question whether or not Wolf ever received the DM 1,800 in 1960, what the relationship between the Claims Conference and Germany was, and whether there was some kind of contractual relationship between Wolf and the Claims Conference, we need not resolve them here. We conclude, for the reasons stated below, that the district court correctly ruled that there is no exception to the general rule of sovereign immunity that would allow this case to go forward against Germany, and that the court correctly determined that Wolf does not have standing to pursue his claim against the Claims Conference.

### A. Federal Republic of Germany

■ All civil actions brought against foreign sovereigns must satisfy the legal stan-

dards found in the Foreign Sovereign Immunities Act. Under the FSIA, "[a] foreign sovereign is normally immune from the jurisdiction of federal and state courts, 28 U.S.C. § 1604, subject to a set of exceptions specified in §§ 1605 and 1607." *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 488, 103 S.Ct. 1962, 1968, 76 L.Ed.2d 81 (1983). The Supreme Court explained the basic structure of the statute in *Argentine Republic v. Amerada Hess Shipping Corporation,* 488 U.S. 428, 434, 109 S.Ct. 683, 688, 102 L.Ed.2d 818 (1989):

> Sections 1604 and 1330(a) work in tandem: § 1604 bars federal and state courts from exercising jurisdiction when a foreign state *is* entitled to immunity, and § 1330(a) confers jurisdiction on district courts to hear suits brought by United States citizens and by aliens when a foreign state is *not* entitled to immunity. (Emphasis in original.)

This means that a foreign state is "presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson,* 507 U.S. 349, 355, 113 S.Ct. 1471, 1476, 123 L.Ed.2d 47 (1993).

Sections 1605 and 1607 of the Act set forth an exclusive list of exceptions to the rule of presumptive immunity. Section 1605 recognizes an exception to immunity, and thus jurisdiction over claims, where the foreign state has

- waived its immunity explicitly or by implication
- engaged in commercial activity
- expropriated property in violation of international law
- acquired rights to United States property
- committed certain torts within the United States
- agreed to arbitration of a dispute

See ABA Antitrust Section, Monograph No. 20, Special Defenses in International Antitrust Litigation at 6 (1995). In addition, § 1607 creates a special exception for counterclaims brought by those who the foreign state chooses to sue in United States courts, if the counterclaim either qualifies for one of the exceptions to immunity recognized in § 1605, or if it arises out of the same transaction or occurrence as the foreign state's claim, or if it is essentially a set-off. The two most commonly invoked exceptions to immunity, however, are those for commercial acts and for tortious acts. See 28 U.S.C. §§ 1605(a)(2), 1605(a)(5). Not surprisingly, these are the two on which Wolf relies to support his claim against Germany. We therefore take a closer look at them.

Wolf argues first that Germany has breached a covenant of good faith and fair dealing, which he claims is recognized by the Illinois courts, and that breach of the covenant amounts to a tort. Thus, he claims, the tortious activity exception to the rule of sovereign immunity supports his case. Putting to one side for the moment the question whether he has in fact stated a claim in tort, we examine first the language of the exception on which he relies. Section 1605(a)(5) provides as follows:

> [ (a) A foreign state shall not be immune from the jurisdiction of the courts of the United States or of the States in any case—]

> (5) not otherwise encompassed in paragraph (2) above [relating to the commercial activity exception], in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except that this paragraph shall not apply to—

>> (A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused; or

>> (B) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights; . . . .

In *Amerada Hess,* the Supreme Court rejected a claim based on this section against the Government of Argentina to recover dam-

ages for a tort allegedly committed by its armed forces on the high seas. It noted first that § 1605(a)(5) is limited to those cases where the injury occurs "in the United States." 488 U.S. at 439, 109 S.Ct. at 691. Realizing this, the plaintiffs had claimed that the tort occurred in "the United States" because their ship, the Hercules, was damaged on the high seas, and the high seas fall within the admiralty jurisdiction of the United States. Unpersuaded, the Supreme Court construed the term "in the United States" more narrowly to refer to the territorial jurisdiction of the United States. Finally, the Court held that the § 1605(a)(5) exception to immunity is not satisfied by a showing that a tort outside the country had effects within it. *Id.* at 441, 109 S.Ct. at 692.

A few years before *Amerada Hess,* this court had occasion to consider § 1605(a)(5) in *Frolova v. Union of Soviet Socialist Republics,* 761 F.2d 370 (7th Cir.1985). Although it acknowledged that one might read § 1605(a)(5) to extend to all cases where the injury occurs in the United States, regardless of where the tortious conduct takes place, it found that the legislative history of § 1605(a)(5) precluded such a broad reading of the law. The House Report stated that the principal reason for including § 1605(a)(5) was to solve the problem of traffic accidents involving diplomats, even though the language was concededly broad enough to reach all tort actions for money damages that did not fall within the discretionary act or intentional tort exceptions. See H.R.Rep. No. 1487 at 20–21, Sen.Rep. No. 1310 at 20 (94th Cong., 2nd Sess., 1976), 1976 U.S.C.C.A.N. 6604, 6619; 1976 WL 14078 (Leg.Hist.). Following language in those reports, the *Frolova* court held that the tortious act or omission, as well as the injury, must occur in the United States. *Id.* at 379. See also *Siderman de Blake v. Republic of Argentina,* 965 F.2d 699, 714 (9th Cir.1992); *Jones v. Petty–Ray Geophysical Geosource, Inc.,* 954 F.2d 1061, 1065 (5th Cir.1992); *Security Pacific National Bank v. Derderian,* 872 F.2d 281, 285 n. 8 (9th Cir.1989).

■ There are a number of problems with Wolf's theory that the tort exception to sovereign immunity applies here, any one of

which is enough to defeat his claim. First, as noted above, this court has held, in line with every other court to consider the matter, that both the tortious act and the injury must occur in the United States. See *Frolova, Siderman de Blake, Jones,* and *Security Pacific, supra.* One possible tortious act might be the German government's refusal to certify that Wolf is eligible for reparations under the Hardship Fund, because of its allegedly mistaken belief that Wolf had already received the nominal payment of DM 1,800. This act, however, clearly took place in Germany, at the Restitution Office in Saarburg. Recognizing this problem, Wolf argues that the tortious act was Germany's breach of a covenant of good faith and fair dealing, which arose pursuant to the Luxembourg Protocols, and that this tort occurred in the United States.

■ We have two problems with this theory: first, assuming that the First and Second Protocols were contracts between Germany and the Claims Conference (and that Wolf was a third-party beneficiary of such a contract), it is difficult to see how Germany breached its agreement (either in the United States or anywhere else); second, assuming that there is both a contract and breach, Wolf faces the problem that Illinois does not recognize a separate tort of breach of the covenant of good faith and fair dealing. In the First Protocol, Germany promised to "take as soon as possible all steps within their constitutional competence to ensure the carrying out of the ... programme [described in the Protocol]." It did so, by enacting the Federal Indemnification Act of 1953 and by administering the various funds over the years. In the Second Protocol, Germany promised to enter into an agreement with Israel, under which it would pay Israel DM 450 million for the benefit of the Claims Conference. Again, it is undisputed that Germany did exactly that. Nothing in either Protocol comes close to a promise to pay a certain amount of money to every victim of National Socialism, either through the Claims Conference or in any other way. Whatever the Claims Conference may have done later on, it is difficult to see how Germany breached any contract that might have

been formed. (The question whether the Protocols are actually "contracts" between Germany and the Claims Conference, as that term is used in private law, is a complex one that we do not need to resolve here, in light of our conclusion on the other issues presented.)

■ The parties agree that Illinois law applies to any possible tort that could be alleged in this case. Unfortunately for Wolf, this is the end of the matter for purposes of § 1605(a)(5). Although the Illinois courts have stated that implicit in every contract is a duty of good faith and fair dealings between the parties to it, *First National Bank of Cicero v. Sylvester,* 196 Ill.App.3d 902, 144 Ill.Dec. 24, 30, 554 N.E.2d 1063, 1069 (1990), *appeal denied,* 133 Ill.2d 555, 149 Ill.Dec. 320, 561 N.E.2d 690 (1990), these duties do not give rise to an independent source of obligations for the parties to a contract. *Beraha v. Baxter Health Care Corp.,* 956 F.2d 1436, 1443 (7th Cir.1992); *Powers v. Delnor Hospital,* 135 Ill.App.3d 317, 90 Ill. Dec. 168, 172, 481 N.E.2d 968, 972 (1985); *Anderson v. Burton Associates, Ltd.,* 218 Ill.App.3d 261, 161 Ill.Dec. 72, 76, 578 N.E.2d 199, 203 (1991) ("vague notions of fair dealing do not form the basis for an independent tort"). Because Illinois does not recognize the tort that Wolf alleges Germany committed within the United States, it follows that this cannot form the basis for overcoming Germany's sovereign immunity.

Wolf also argues that Germany's actions were within the commercial activity exception to the FSIA found at § 1605(a)(2). As the language shows, this exception is somewhat broader than the tort exception. It removes immunity for actions of a foreign state:

> (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

The statute defines a "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act." § 1603(d). It explains further that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *Id.* The question here is whether Germany was engaged in a "commercial activity" when it entered into the First and Second Protocols or when it otherwise acted to set up and fund programs to pay reparations to Holocaust survivors.

■ The meaning of the word "commercial" in the statute is "the meaning generally attached to that term under the restrictive theory [of sovereign immunity] at the time the statute was enacted." *Republic of Argentina v. Weltover,* 504 U.S. 607, 612–13, 112 S.Ct. 2160, 2165–66, 119 L.Ed.2d 394 (1992). Under the restrictive theory of foreign sovereign immunity, "a state is immune from the jurisdiction of foreign courts as to its sovereign or public acts (*jure imperii*), but not as to those that are private or commercial in character (*jure gestionis*)." *Saudi Arabia v. Nelson,* 507 U.S. at 359–60, 113 S.Ct. at 1479. A state engages in commercial activity only when it exercises powers that can also be exercised by private citizens, or when it acts like a private player in the market. *Id.* In *Weltover,* therefore, the Court held that Argentina's refinancing of certain bonds qualified as commercial activity, because private parties could have done the same thing, regardless of any governmental motivation Argentina may have had. 504 U.S. at 615–17, 112 S.Ct. at 2166–68.

■ Applying these standards, we conclude that Germany's actions were not commercial within the meaning of the FSIA. It promised to enact and administer legislation in the First Protocol, and it promised to enter into an international agreement with another sovereign state, Israel, in the Second Protocol. It issued regulations from time to time designed to implement its public program to pay reparations to the victims of National Socialism. These are sovereign acts, not the kind of ordinary commercial transaction that a private party might under-

take. The fact that money changes hands when Germany certifies a claimant's eligibility to the Claims Conference, and the Claims Conference then makes either a one-time payment or regular monthly payments, does not transform these governmental undertakings into ordinary market transactions. Money changes hands when people receive tax refunds from the government, too, but no one thinks that this makes the administration of the Internal Revenue Service akin to a private commercial enterprise. Germany was not engaged in "commercial activity" for purposes of § 1605(a)(2), and thus it did not lose its sovereign immunity on this basis either.

Wolf has no other suggestions for overcoming Germany's immunity under § 1604 of the FSIA, nor can we find any. We therefore agree with the district court that it lacked jurisdiction over the suit against Germany, see § 1330(a), and that the claims had to be dismissed.

### B. The Claims Conference

■ Wolf's suit against the Claims Conference founders on the threshold issue of his standing to sue. In order to maintain this suit, he must establish that he had a legally protected interest that the Claims Conference invaded. See *Warth v. Seldin,* 422 U.S. 490, 500, 508, 95 S.Ct. 2197, 2205, 2210, 45 L.Ed.2d 343 (1975); *Israel Travel Advisory Service, Inc. v. Israel Identity Tours, Inc.,* 61 F.3d 1250, 1258 (7th Cir.1995). *Cf. Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). Unfortunately for him, neither the Luxembourg Protocols nor the Hardship Fund Guidelines support such a claim. The Protocols, which as we have already noted were concerned with various actions of the German government, do not expressly create any right to recover for particular individuals or classes of individuals. The language throughout is aspirational in tone. The Second Protocol, Article 2, for example, provides that the DM 450 million "will be used for the relief, rehabilitation and resettlement of Jewish victims of National Socialist persecution, according to the urgency of their needs as determined by the Conference on Jewish Ma-

terial Claims against Germany." See Appellant's Appendix at A137. This is the language of discretion, not obligation toward particular individuals. The 1980 Guidelines for the Hardship Fund, which is the particular fund at issue in Wolf's case here, specifically provide that "[n]o right of action to receive compensation is hereby created." Appellant's Appendix at A79. See also *Revici v. Conference of Jewish Material Claims Against Germany,* 11 Misc.2d 354, 174 N.Y.S.2d 825 (1958), which holds that the Luxembourg Protocols "bar[ ] the right of any individual to question in court the manner in which the [Claims Conference] is discharging its duties." *Id.* 174 N.Y.S.2d at 828. With no rights under the agreements, Wolf has no claim to pursue.

In summary, we conclude that (1) the district court had no jurisdiction over Wolf's suit against the Federal Republic of Germany, because no exception to sovereign immunity was available, and (2) Wolf has no standing to challenge the manner in which the Claims Conference is administering the Hardship Fund. We therefore have no need to address the other arguments the parties have presented, including the applicability of the act of state doctrine and the availability of arbitral procedures for resolving this dispute. The judgment of the district court is AFFIRMED.