In the
United States Court of Appeals
For the Seventh Circuit

No. 97-3555

Jacob Sampson,

Plaintiff-Appellant,

v.

Federal Republic of Germany and
Claims Conference, Article 2 Fund,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 96 C 6242--Ann Claire Williams, Judge.

Argued February 13, 2001--Decided May 23, 2001

Before Manion, Kanne, and Evans, Circuit
Judges.

Manion, Circuit Judge.  Jacob Sampson,
pro se, sued Germany for his imprisonment
in Nazi concentration camps, and sued
Germany and the Conference on Jewish
Material Claims Against Germany, Inc.
("Claims Conference") for reparations
from funds created for Holocaust
survivors. The district court dismissed
the complaint concluding that Germany was
immune from suit and that Sampson lacked
standing to sue the Claims Conference.
Sampson appeals. We affirm.

I.

Sampson's complaint alleges horrors
which are beyond belief, and the evils he
describes cannot be condemned in strong
enough terms./1 In 1939, Sampson was
imprisoned in the Lodz ghetto in Poland.
He was subsequently transported by cattle
car to the Auschwitz concentration camp,
where he was forced to perform slave
labor. At Auschwitz, the Gestapo killed
all sixty members of his family. Sampson
somehow survived, and he is now a United
States citizen and resident of Chicago.

The Claims Conference is an
international coalition of twenty-three
Jewish nonprofit organizations. For

nearly half a century, the Claims Conference has engaged in discussions with Germany to secure restitution for Jewish survivors of the Holocaust. In 1952, the Claims Conference and Germany agreed on Protocols to achieve this goal. Protocol No. 1 called for Germany to "redress . . . [Nazi] wrongs" and "take as soon as possible all steps within [its] constitutional competence to ensure the carrying out of the [agreed upon] programme." Pursuant to this Protocol, Germany enacted the German Federal Indemnification Law, which provided for restitution to Holocaust victims. Since restitution would be impossible as a practical matter in many cases, the parties also entered into Protocol No. 2. Under Protocol No. 2, Germany agreed to pay Israel DM 450 million for the benefit of the Claims Conference which would use the money to provide for the "relief, rehabilitation and resettlement of Jewish victims of National Socialist persecution [who did not live in Israel], according to the urgency of their needs." Disputes concerning the disbursement of this money would be handled by an Arbitral Commission established between Israel and Germany.

However, not every Holocaust survivor received compensation through this process. Accordingly, in 1980, the Claims Conference and Germany established the "Hardship Fund" to give a one-time payment to Holocaust survivors who had not received prior compensation. The Claims Conference administers the Hardship Fund, but its sole role is to determine whether the claimants meet the German guidelines--not to differentiate among qualified applicants in the amount of payment. The Hardship Fund prohibits "a right of action to receive compensation."

In 1990, Germany and the Claims Conference established the "Article 2 Fund" to provide compensation to Holocaust victims who had received minimal or no compensation. The Article 2 Fund provides for a one-time payment of DM 5,000 and monthly payments of DM 500 to these individuals. The Claims Conference also administers the Article 2 Fund, but has no discretion to deviate from Germany's guidelines. The Article 2 Fund declares that "[t]here is no legal claim to the payments provided according

to this agreement."

Most recently, on July 17, 2000, the United States and Germany signed an agreement (the "Foundation Agreement") which created the "Remembrance, Responsibility and the Future Foundation" (the "Foundation"). The Foundation is a joint instrumentality of the German government and German companies formed to make payments to individuals who were forced laborers under the Nazi regime or who suffered injury or property loss due to the acts of German companies. As part of the Foundation Agreement, the United States promised to "take appropriate steps to oppose any challenge to the sovereign immunity of the Federal Republic of Germany with respect to any claim . . . concerning the consequences of the National Socialist era and World War II." The Agreement took effect on October 19, 2000.

Sampson first requested compensation from Germany in 1948. This effort received no response. In 1981, he filed a claim with the Hardship Fund, which also received no response. However, in February 1996, Sampson was compensated; he received a one-time payment of DM 5,000 as well as monthly payments of DM 500 retroactive to August 1995 from the Article 2 Fund.

Subsequently, Sampson filed suit in federal district court against Germany and the Claims Conference seeking $10 million plus costs. Sampson sought compensation from Germany based on his enslavement during World War II, and from Germany and the Claims Conference for an alleged conspiracy to deprive him of full compensation for his injuries. Specifically, Sampson alleged the defendants conspired to embezzle funds intended for Holocaust victims, breached their covenant with him, and discriminated against him.

Germany and the Claims Conference moved to dismiss Sampson's complaint. The district court dismissed the claims against Germany, concluding Germany was immune from suit under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. secs. 1330, 1602-11, and under the act of state doctrine. The district court also granted the Claims Conference's motion to dismiss, concluding that

Sampson had no right to payment by the Claims Conference and that the act of state doctrine precluded suit against the Claims Conference in any event.

Sampson appealed the dismissals to this court. On appeal, this court appointed Dean Howard Eisenberg and Professor Joseph Kearney of Marquette University Law School as amicus curiae ("Amicus") to argue on Sampson's behalf. Amicus briefed the issue of whether Germany has immunity under the FSIA for acts which violate jus cogens norms of customary international law, and whether these claims are barred by a statute of limitations. This court postponed oral argument to permit the United States government to file a brief. The United States government filed a brief as amicus curiae (the "United States") in support of Germany's argument that it had sovereign immunity for its acts during World War II.

II.

On an appeal from a motion to dismiss, we review the dismissal de novo, accepting all well-pleaded factualallegations in the complaint as true, and making all reasonable inferences in the non-movant's favor. See Gonzalez v. City of Chicago, 239 F.3d 939, 940 (7th Cir. 2001). In this case, the district court dismissed the counts against Germany based on sovereign immunity.

"We start from the settled proposition that the subject matter jurisdiction of the lower federal courts is determined by Congress 'in the exact degrees and character which to Congress may seem proper for the public good.'" Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 433 (1989) (quoting Cary v. Curtis, 44 U.S. (3 How.) 236, 245 (1845)). Relevant to this appeal is the FSIA, the federal statute in which Congress defined "the sole basis for obtaining jurisdiction over a foreign state in our courts." Id. at 434./2

Specifically, the FSIA provides that "[s]ubject to existing international agreements to which the United States is a party at the time of the enactment of this Act[,] a foreign state shall be immune from the jurisdiction of the courts of the United States and of the

States except as provided in sections 1605 to 1607 of this chapter." 28 U.S.C. sec.1604. The FSIA also provides that "[t]he district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state . . . as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any international agreement." 28 U.S.C. sec. 1330(a). Thus, "[u]nder the Act, a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993)./3 Accordingly, we must determine whether the general grant of sovereign immunity in the FSIA, or one of the exceptions, applies to Sampson's claims.

Sampson and Amicus argue that this court has jurisdiction under Section 1605(a)(1) of the FSIA, which provides an exception to sovereign immunity where a "foreign state has waived its immunity . . . by implication." Specifically, Sampson and Amicus argue that a violation of a non-derogable jus cogens norm of customary international law constitutes an implied waiver of a foreign state's sovereign im munity.

To understand this argument some additional background is necessary. Customary international law is the "general and consistent practice of states followed by them from a sense of obligation." See Restatement (Third), The Foreign Relations Law of the United States sec. 102(2) (1987). Courts determine the content of customary international law by "consulting the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognizing and enforcing that law." United States v. Smith, 18 U.S. (5 Wheat.) 153, 160-61 (1820).

A jus cogens norm is a special type of customary international law. A jus cogens norm "'is a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be

modified only be a subsequent norm of general international law having the same character.'" See Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 714 (9th Cir. 1992) (quoting Vienna Convention on the Law of Treaties, art. 53, May 23, 1969, 1155 U.N.T.S. 332, 8 I.L.M. 679). Most famously, jus cogens norms supported the prosecutions in the Nuremberg trials. See Siderman, 965 F.2d at 715 (9th Cir. 1992) ("The universal and fundamental rights of human beings identified by Nuremberg--rights against genocide, enslavement, and other inhumane acts . . . --are the direct ancestors of the universal and fundamental norms recognized as jus cogens.").

"Courts seeking to determine whether a norm of customary international law has attained the status of jus cogens look to the same sources [as for customary international law], but must also determine whether the international community recognizes the norm as one 'from which no derogation is permitted.'" See id., 965 F.2d at 715 (quoting Committee of U.S. Citizens Living in Nicaragua v. Reagan ("CUSCLUN"), 859 F.2d 929, 940 (D.C. Cir. 1988)). "While jus cogens and customary international law are related, they differ in one important respect. Customary international law, like international law defined by treaties and other international agreements, rests on the consent of states." Id. In contrast, a state is bound by jus cogens norms even if it does not consent to their application.

"International law does not recognize an act that violates jus cogens as a sovereign act." Siderman, 965 F.2d at 718. Thus, a violation of jus cogens norms "would not be entitled to the immunity afforded by international law." See id. Sampson and Amicus note that Germany's crimes against humanity during World War II are not entitled to immunity as sovereign acts under international law because they violate jus cogens norms. In addition, they note that the House Report when the FSIA was enacted stated that "the central premise of the bill [is] [t]hat decisions on claims by foreign states to sovereign immunity are best made by the judiciary on the basis of a statutory regime which incorporates standards recognized under international law." H.R. Rep. No. 1487, reprinted in

1976 U.S.C.C.A.N., at 6613. Accordingly, they urge us to hold that the FSIA's implied waiver exception to sovereign immunity extends to violations of jus cogens norms.

Initially, we note that we have held in other contexts that the implied waiver provision of the FSIA is to be narrowly construed. See Frolova v. Union of Soviet Socialist Republics, 761 F.2d 370, 377 (7th Cir. 1985). In fact, "courts rarely find that a nation has waived its sovereign immunity, particularly with respect to suits brought by third parties, without strong evidence that this is what the foreign state intended." Id. See also Princz, 26 F.3d at 1174; Foremost-McKesson, Inc. v. Islamic Republic of Iran, 905 F.2d 438, 444 (D.C. Cir. 1990). Cf. Amerada Hess, 488 U.S. at 442-43 (holding that a foreign state cannot "waive its immunity under sec.1605(a)(1) by signing an international agreement that contains no mention of a waiver of immunity to suit in United States courts or even the availability of a cause of action in the United States."). Thus, "an implied waiver depends upon the foreign government's having at some point indicated its amenability to suit." Princz, 26 F.3d at 1174.

In this case, there is no evidence that Germany indicated, either expressly or implicitly, that it was willing to be sued in the United States based on actions during World War II. See id. (concluding no evidence existed that Germany "indicated, even implicitly, a willingness to waive immunity for actions arising out of the Nazi atrocities."). Sampson responds that the following constitutes evidence that Germany waived its sovereign immunity: a letter from the German government stating that the German people is responsible for the past; a letter from the Claims Conference stating that Sampson was eligible to receive compensation payments; and a holding by the German Supreme Constitutional Court regarding jus cogens norms. See Pl. Br. at 14. But these statements do not indicate an intent by the state of Germany to be subject to suit in United States courts; they merely demonstrate that Germany recognizes that its actions during World War II constituted violations of jus cogens norms. Nor is

there any other evidence in the record, much less the strong evidence sufficient to demonstrate Germany's intent to waive its immunity.

Our conclusion that Germany did not impliedly waive its sovereign immunity under the FSIA finds support in decisions rendered by three of our sister circuits. In Siderman, the Ninth Circuit addressed a claim that Argentina had impliedly waived its sovereign immunity based on the jus cogens norm against torture. The Court concluded that the Supreme Court's holding in Amerada Hess, that the FSIA was the sole basis of jurisdiction over foreign sovereigns, precluded a finding that an implied waiver exception existed for jus cogens violations. In Princz, a case involving claims similar to Sampson's, the D.C. Circuit reached the same conclusion. The court based its holding on its determination that the implied waiver exception to the FSIA required an indication that the foreign sovereign intended to waive its sovereign immunity. And in Smith v. Socialist People's Libyan Arab Jamahiriya, 101 F.3d 239 (2d Cir. 1997), a case involving international terrorism, the Second Circuit held that Congress did not intend the implied waiver provision to extend to jus cogens violations.

Amicus argues in response that while an implied waiver under Section 1605(a)(1) must generally demonstrate a clear intent by the state to waive its sovereign immunity, that principle does not apply to cases involving violations of jus cogens norms of international law. This argument tracks Judge Wald's dissent in Princz:

Jus cogens norms are by definition nonderogable, and thus when a state thumbs its nose at such a norm, in effect overriding the collective will of the entire international community, the state cannot be performing a sovereign act entitled to immunity.

Princz, 26 F.3d at 1182 (Wald, J., dissenting). See also Adam C. Belsky, et al., Comment, Implied Waiver Under the FSIA: A Proposed Exception to Immunity for Violations of Peremptory Norms of International Law, 77 Cal.L.Rev. 365, 396 (1989) ("Whether or not states intend to waive their immunity by conducting

commercial activities in foreign states, their actions are not recognized as sovereign acts and are not accorded immunity under the restrictive theory of immunity. Similarly, because, under international law, states are not recognized as acting within their sovereign capacity when they derogate from a rule of jus cogens, they should not be entitled to claim sovereign immunity.").

Amicus further points to Chief Justice Marshall's famous statement that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains," see Murray v. The Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 118 (1804), arguing that because under international law violations of jus cogens norms constitute a waiver of immunity, we should interpret them as a waiver under the FSIA also. The principle on which Amicus relies in making this argument is known as the "Charming Betsy canon," and it has traditionally justified a narrow interpretation of ambiguous legislation to avoid violations of international law.

While the Charming Betsy canon directs courts to construe ambiguous statutes to avoid conflicts with international law, international law itself does not mandate Article III jurisdiction over foreign sovereigns. In other words, although jus cogens norms may address sovereign immunity in contexts where the question is whether international law itself provides immunity, e.g., the Nuremberg proceedings, jus cogens norms do not require Congress (or any government) to create jurisdiction. Because international law is silent on the grant of federal court jurisdiction at issue, we interpret the FSIA without reference to the Charming Betsy canon.

Nevertheless, Amicus argues that the Charming Betsy canon requires us to construe the terms of an ambiguous statute so that it is consistent with the content of international law. Even assuming the FSIA is ambiguous, Amicus's reading of Charming Betsy would require us to apply the canon even where it is unnecessary to avoid a violation of international law. Judicial support for this view can be found in a few isolated statements. For example, in her dissent

in Princz, Judge Wald cited the well-established principle that "[i]nternational law is part of our law," Paquete Habana, 175 U.S. 677, 700 (1900), and claimed that therefore "we must, wherever possible, interpret United States law consistently with international law." Princz, 26 F.3d at 1183 (Wald, J., dissenting). See also Amerada Hess Shipping Corp. v. Argentine Republic, 830 F.2d 421, 426 (2d Cir. 1987), rev'd on other grounds, 488 U.S. 428 (1989) ("Since international law would deny immunity in these circumstances, we would construe the FSIA to grant immunity only if Congress clearly expressed such an intent."). Citing Charming Betsy, Judge Wald further concluded that "[t]he only way to reconcile the FSIA's presumption of foreign sovereign immunity with international law is to interpret sec. 1605(a)(1) of the Act as encompassing the principle that a foreign state implicitly waives its right to sovereign immunity in United States courts by violating jus cogens norms." Princz, 26 F.3d at 1183 (Wald, J., dissenting).

We note that the D.C. Circuit rejected Judge Wald's view, holding instead that the intent of Congress would have to be clearer before it would be appropriate to find an implied waiver of sovereign immunity for jus cogens violations. As Judge Ginsburg noted in Princz:

We think that something more nearly express [than the FSIA implied waiver provision] is wanted before we impute to the Congress an intention that the federal courts assume jurisdiction over the countless human rights cases that might well be brought by the victims of all the ruthless military juntas, presidents-for-life, and murderous dictators of the world, from Idi Amin to Mao Zedong. Such an expansive reading of sec. 1605 (a)(1) would likely place an enormous strain not only upon our courts but, more to the immediate point, upon our country's diplomatic relations with any number of foreign nations. In many if not most cases the outlaw regime would no longer even be in power and our Government could have normal relations with the government of the day--unless disrupted by our courts, that is.

26 F.3d at 1174, n.1.

Moreover, although international law is "part of our law," it does not follow that federal statutes must be read to reflect the norms of international law./4 Cf. United States v. Yunis, 924 F.2d 1086, 1091 (D.C. Cir. 1991) ("Our duty is to enforce the Constitution, laws and treaties of the United States, not to conform the law of the land to norms of customary international law."). Since customary international law in the modern era is often based on the contents of multi-lateral treaties to which the United States attaches reservations (or refuses to join at all), there is also little reason to indulge in a presumption that Congress intends courts to mold ambiguous statutes into consistency with customary international law. Use of the canon so as to effectively incorporate customary international law into federal statutes when the political branches of our government may have rejected the international law at issue seems dubious at best. Cf. Stanford v. Kentucky, 492 U.S. 361, 369 n.1 (1989) ("We emphasize that it is American conceptions of decency that are dispositive [in interpreting the Eighth Amendment], rejecting the contention of petitioners and their various amici . . . that the sentencing practices of other countries are relevant.") (emphasis in original). Indeed, the statutory text provides immunity "[s]ubject to existing international agreements to which the United States [was] a party at the time of the enactment of the Act," 28 U.S.C. sec. 1604, language which indicates that Congress was cautious about the development and source of future exceptions to the immunity it granted.

There is even less justification for an expansive reading of Charming Betsy in light of the chameleon qualities of international law. Cf. CUSCLUN, 859 F.2d at 940 ("[C]ustomary international law is continually evolving.")./5 If courts were to interpret statutes according to their view of what best fits the changing nuances of customary international law, they would frequently make decisions that run up against the foreign policy of the other two branches of our government. And rather than encouraging peaceful relations with other nations, such an expansive reading of the Charming Betsy canon would predictably create tensions

in cases like this one, which involve jurisdiction over foreign sovereigns.

Amicus argues that the phrase "waive[r] . . . by implication" in section 1605(a)(1), in conjunction with a legislative history that references common law examples of waiver, indicates a congressional intent that courts develop a common law to determine when an implied waiver occurs. That would mean a decision whether an implied waiver exists would be based on the evolving recognition of jus cogens norms in United States courts. If anything, the legislative history of section 1605(a)(1) cuts against Amicus's argument by providing very specific examples of implied waiver: "(1) a foreign state has agreed to arbitration in another country; (2) a foreign state has agreed that acontract is governed by the law of a particular country; and (3) a foreign state has filed a responsive pleading in a case without raising the defense of sovereign immunity." Frolova, 761 F.2d at 377. These are all narrow examples which have a nexus with legal proceedings in the United States, and do not suggest a congressional intent that the list of potential waivers be extended. Courts have been reluctant to stretch claims of implied waiver beyond these examples. See Socialist People's Libyan Arab Jamahiriya, 101 F.3d at 244 ("Our reluctance to construe the concept of implied waiver to include all violations of jus cogens . . . is based on our understanding of what the 94th Congress meant when it illustrated the inexact phrase 'waive[r] . . . by implication' with examples drawn entirely from thelitigation context.").

Moreover, Amicus's common law argument would be ground-breaking. Amicus encourages this court to engage in an evolving understanding of waiver, an understanding which is necessarily subject to the vagaries of customary international law. Customary international law can evolve unpredictably without reference to the understandings of courts or Congress. While it is true that Congress intended the FSIA to be "a statutory regime which incorporates standards recognized under international law," H.R. Rep. No. 1487, reprinted in 1976 U.S.C.C.A.N., at 6613, Amicus's suggestion would entail a truly

novel and possibly unrestrained form of jurisdiction. Congress's general desire to follow standards recognized under international law does not provide the foundation needed to support that proposed reading of an implied waiver. As this court has noted, "'[n]o legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice--and it frustrates rather than effectuates legislative intent simplistically to assume that whatever furthers the statute's primary objective must be the law.'" Continental Can Co. v. Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund, 916 F.2d 1154, 1159 (7th Cir. 1990) (Easterbrook, J.) (quoting Rodriguez v. United States, 480 U.S. 522, 525-26 (1987)). Congress could not have intended to confer a jurisdiction so malleable on Article III courts without a clear statement to that effect.

Also, jus cogens norms are even now an uncertain means to determine whether a foreign sovereign has waived jurisdiction, and missteps in this area would have profound effect. A leading treatise on international law has stated that jus cogens is "a comparatively recent development and there is no general agreement as to which rules have this character." See Oppenheim's International Law 7 (9th ed. 1992). The absence of agreement among international law scholars is so striking that one commentator expressed the status of jus cogens in the following terms: "no one knows where jus cogens comes from, no one knows whether or how or why it is part of international law, no one knows its content, no one knows how to modify it once it is articulated, and indeed no one knows whether it even exists." See Anthony D'Amato, Human Rights as Part of Customary International Law: A Plea for Change of Paradigms, 25 Ga. J. Int'l & Comp. L. 47, 57 (1995-1996). We do not question that the allegations in Sampson's complaint rise to the level of jus cogens violations--they are a paradigm case--but that does not mean that Congress intended an implicit waiver provision to encompass this expanding legal doctrine.

Amicus urges us to look to examples in areas of the statutory law which are known for their imprecision, such as antitrust, that require courts to elaborate their content through common law reasoning. But, as the Supreme Court has noted, antitrust is the exception: "[i]n antitrust, the federal courts enjoy more flexibility and act more as common-law courts than in other areas governed by federal statute." See Northwest Airlines, Inc. v. Transp. Workers Union of America, 451 U.S. 77, 99 n.42 (1981). The comparison is inapt, moreover. While certain statutes look to pre-existing common law definitions for their terms, or may even call for a common law interpretation which evolves over the years, these examples are a far cry from a common law which develops pursuant to the ideas of commentators and academics who do not hold judicial office and whose reasoning is not grounded in the framework of positive domestic law. At least in the former context, courts develop the common law in accord with this nation's legal history and established norms. Domestic courts (and for that matter the other two branches of our government), do not determine the content of the jus cogens doctrine. Instead, it emanates from academic commentary and multilateral treaties, even when unsigned by the United States. Only as a last resort should United States courts infer jurisdiction over foreign sovereigns through this loosely woven subject matter. See also Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 827 (D.C. Cir. 1984) (Robb, J., concurring) ("Courts ought not to serve as debating clubs for professors willing to argue over what is or what is not an accepted violation of the law of nations."). Absent congressional direction, such overactive involvement by our judiciary would challenge the consent-based structure of our constitutional system.

In interpreting the FSIA, we are mindful that "judicial resolution of cases bearing significantly on sensitive foreign policy matters, like the case before us, might have serious foreign policy implications which courts are ill-equipped to anticipate or handle." Frolova, 761 F.2d at 375. The potential scope of a customary international law exception to foreign sovereign immunity,

even in the jus cogens context, would allow for a major, open-ended expansion of our jurisdiction into an area with substantial impact on the United States' foreign relations. As noted by the Supreme Court in Oetjen v. Central Leather Co., 246 U.S. 297, 302 (1918), "[t]he conduct of the foreign relations of our government is committed by the constitution to the Executive and Legislative--'the political'--Departments of the Government." Deference to the foreign policy of the political branches of our government requires us to exercise caution before inferring that Congress intended the implied waiver provision to cover cases like this one. Cf. Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 433 (1964) (explaining undesirability of adjudication of international law where it might create conflicts with the foreign policy of the Executive branch in future cases). We again determine, as we did in Frolova, that our jurisdiction under the FSIA should be construed narrowly, and conclude that Congress did not create an exception to foreign sovereign immunity under the FSIA for violations of jus cogens norms.

Sampson also claims on appeal that the Claims Conference violated his civil rights, breached a covenant, and embezzled funds, in conspiracy with Germany. In essence, Sampson argues that he was not compensated as much as he should have been under the funds administered by the Claims Conference./6 This argument has already been addressed in this circuit in Wolf v. Federal Republic of Germany, 95 F.3d 536 (7th Cir. 1996).

Sampson lacks standing to bring these claims because the funds administered by the Claims Conference do not provide him with a right to compensation. As this court stated in Wolf, "[i]n order to maintain this suit, [plaintiff] must establish that he had a legally protected interest that the Claims Conference invaded." See id. at 544 (citing Warth v. Seldin, 422 U.S. 490, 500 (1975); Israel Travel Advisory Service, Inc. v. Israel Identity Tours, Inc., 61 F.3d 1250, 1258 (7th Cir. 1992)). The Protocols "'bar[ ] the right of any individual to question in court the manner in which the [Claims Conference] is discharging its duties.'"

See Wolf, 95 F.3d at 544 (quoting Revici v. Conf. of Jewish Material Claims Against Germany, 174 N.Y.S.2d 825 (1958)). The 1980 Guidelines for the Hardship Fund state that "[n]o right of action to receive compensation is hereby created." See id. The Article 2 Fund states that "[t]here is no legal claim to the payments provided according to this agreement." As explained in detail in Wolf, neither the Protocols nor the Hardship Fund Guidelines create any right to recover for particular individuals or classes of individuals. Sampson, accordingly, lacks standing to sue the Claims Conference.

III.

Sampson's claims against Germany are barred by the FSIA and his claims against the Claims Conference are barred by his lack of standing. We conclude that Congress did not create an implied waiver exception to foreign sovereign immunity under the FSIA for jus cogens violations. Accordingly, we hold that the district court lacked jurisdiction over Sampson's suit and therefore do not address the merits or the application of the act of state doctrine to this case. The district court is AFFIRMED.

FOOTNOTES

/1 For purposes of Sampson's appeal from the district court's dismissal, we accept the allegations of the complaint as true.

/2 It is possible to construe Sampson's brief as arguing that jurisdiction exists under the Alien Tort Claims Act, 28 U.S.C. U.S.C. sec. 1350. See App. Br. at 9-10 (arguing under international law that there is universal jurisdiction "when a heinous crime is involved" and that the Alien Tort Claims Act provides a cause of action in this case). Although Amerada Hess involved violations of customary international law that were not jus cogens violations, see infra, the Supreme Court's statement that our jurisdiction is limited to exceptions under the FSIA was absolute, and was based in part on the determination that Congress intended sovereign immunity under the statute to apply even in instances where international law was violated. The Court's holding appears to foreclose Sampson's argument.

/3 Germany and the United States raise the possibility that the FSIA does not apply in this case because it involves pre-1952 acts, in which case Germany would be immune under the law in exis-

tence at that time. For most of this country's history, "the United States generally granted foreign sovereigns complete immunity from suit in the courts of this country." See Verlinden B.V. v. Centr. Bank of Nigeria, 461 U.S. 480, 486 (1983) (citing Schooner Exchange v. M'Faddon, 7 Cranch 116 (1812)). This immunity was not constitutionally based, however, but reflected "grace and comity" by the United States to other nations. See id. In 1952, however, the State Department announced its adoption of a "restrictive" theory of foreign sovereign immunity, under which immunity is limited to suits involving a foreign sovereign's public acts, but not its strictly commercial acts. See id. at 487. In 1976, Congress, for the most part, codified the restrictive theory in the FSIA. See id. at 488. We need not decide whether the pre-1952 law or the less stringent theory of sovereign immunity codified in the FSIA applies because, as discussed below, Sampson's suit against Germany is barred even under the lower standards of the FSIA. See also Princz v. Federal Republic of Germany, 26 F.3d 1166, 1170-71 (D.C. Cir. 1994).

/4 Several early Supreme Court decisions explain that customary international law is part of the law of the United States. See, e.g., The Paquete Habana, 175 U.S. 677 (1900); United States v. Smith, 18 U.S. (5 Wheat.) 153 (1820). During the nineteenth century, however, this apparently meant that customary international law was included in the general common law recognized in Swift v. Tyson, 41 U.S. (14 Pet.) 1 (1842). The general common law, unlike the federal common law of today, did not fall under the Supremacy Clause of the United States Constitution. Thus, the exact meaning of these early pronouncements on the domestic role of customary international law became less certain after the Supreme Court's rejection of a general common law in Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938).

One view of customary international law holds that, post-Erie, it is federal common law. See Kadic v. Karadzic, 70 F.3d 232, 246 (2d Cir. 1995) (describing "settled proposition that federal common law incorporates international law."); In re Estate of Ferdinand E. Marcos Human Rights Litigation, 978 F.2d 493, 502 (9th Cir. 1992) ("It is . . . well settled that the law of nations is part of federal common law."). Another leading view is that customary international law is "like common law." See Restatement, sec. 111, comment d. Under this theory, customary international law is federal law that can arguably supersede prior federal statutes. See, e.g., Louis Henkin, The Constitution and United States Sovereignty: A Century of Chinese Exclusion and Its Progeny, 100 Harv. L. Rev. 853, 876 (1987).

Both of these positions have come under fire. See, e.g., Curtis A. Bradley & Jack L. Goldsmith, Customary International Law as Federal Common Law: A Critique of the Modern Position, 110 Harv. L. Rev. 815 (1997) (arguing that federalism and separation of powers principles are violated by treating customary international law as federal law); Arthur M. Weisburd, State Courts, Federal Courts, and International Cases, 20 Yale J. Int'l L. 1 (1995) (same); Phillip R. Trimble, A Revisionist View of Customary International Law, 33 UCLA L. Rev. 665 (1986) (arguing that treating customary international law as federal law conflicts with the principle of consent upon which the United States was founded).

In light of the present uncertainty about the precise domestic role of customary international law, the statement that international law is part of our law provides limited support for the proposed application of Charming Betsy. Even assuming the most expansive domestic role for international law is required by these early Supreme Court precedents, however, it still does not follow that Charming Betsy should be read so broadly, for the reasons developed below.

/5 The fact that some jus cogens norms are beyond question, such as the norm against slavery, is beside the point. The fact that jus cogens norms as a whole are subject to change without input from any branch of the United States government is reason to doubt that it is appropriate to apply the Charming Betsy canon in the manner suggested by Amicus.

/6 To the extent Sampson's appeal of these claims may cover Germany as well as the Claims Conference, we find that Sampson's lack of standing, explained below, is fatal to his claim.